TRAMMELL CROW AND MARGARET D. CROW, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3239–76.    Filed September 27, 1982.

*Vester T. Hughes, Jr., W. John Glancy*, and *Douglas Carson Bunch*, for the petitioners.

*Raymond L. Collins* and *Rebecca W. Wolfe*, for the respondent.

RAUM, *Judge:*[*] On May 10, 1971, petitioners filed an application for refund of income tax for years prior to 1970 based on a carryback of a claimed 1970 net operating loss and an unused investment credit for that year. The Commissioner determined that petitioners were not entitled to refunds and that there were deficiencies in petitioners' income tax of $427,056.13 for 1968 and $66,440.13 for 1969. Additionally, the Commissioner in his answer, in the alternative, determined

---

[*]This case was tried before Judge Sheldon V. Ekman, who died on Jan. 18, 1982. It was reassigned to Judge Arnold Raum for disposition by order of the Chief Judge.

"increased deficiencies" in petitioners' income tax in the amounts of $1,273,735.62 for 1968 and $3,005,060.32 for 1969. After concessions by the parties, the principal issue remaining for decision is whether losses sustained by petitioners on the sale in 1970 of Bankers National Life Insurance Co. stock and Lomas & Nettleton Financial Corp. stock constitute "business capital losses" or "nonbusiness capital losses" within section 1.172–3(a)(2), Income Tax Regs. If the Court should find sufficient business characteristics relating to the shares of Bankers National and Lomas & Nettleton to reach a conclusion in favor of petitioners, the Commissioner, in support of the increase in deficiencies in his answer, presents the further question whether petitioners realized ordinary income rather than capital gains in 1967,[1] 1968, and 1969 on sales of shares of stock in other corporations which were alleged to have been similarly held.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, the first supplemental stipulation of facts as amended, the second supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference.

Trammell Crow (hereinafter sometimes referred to as petitioner) and Margaret D. Crow, husband and wife, resided in Dallas, Tex., at the time they filed their petition herein. They filed their joint Federal income tax returns for the calendar years 1967, 1968, 1969, and 1970 with the Director, Internal Revenue Service Center, Austin, Tex.

For over 30 years, petitioner Trammell Crow has been engaged in various phases of the real estate business. His principal activities (both individually and through partnerships or joint ventures) consist of the purchase of improved or unimproved real estate; the purchase, construction, operation, and leasing of apartment projects, warehouse facilities, shopping centers, and office buildings; and the construction,

---

[1] In the statutory notice, the Commissioner made adjustments for 1967, 1968, and 1969, but determined deficiencies for 1968 and 1969 only. Therefore, although we may ascertain the correct tax for 1967 in so far as it affects the propriety of the 1968 and 1969 deficiency determinations, we "have no jurisdiction to determine whether or not the tax for * * * [1967] has been overpaid or underpaid." Sec. 6214(b), I.R.C. 1954.

leasing, and operation of hotels. Petitioner employed some 500 to 600 persons (apart from a considerably larger number of construction employees) to assist him in the conduct of his real estate and financial activities whether carried on as a sole proprietor or as a participant in various ventures. The activities of petitioner and his employees as thus engaged have been loosely designated in the aggregate as the Trammell Crow Co. and for convenience will sometimes hereinafter be referred to as petitioner's organization.

The acquisition of real estate and construction of improvements thereon, on the scale carried on by petitioner, requires substantial amounts of capital. Petitioner found it necessary to acquire the capital from outside sources either as debt or equity. Principal sources of funds for use in petitioner's business have been banks, insurance companies, mortgage brokers, and investment bankers. At least during the years 1967–70, the principal lenders were Lomas & Nettleton Financial Corp. and the First National Bank in Dallas, as more fully set forth hereinafter. Eastdil Realty, Inc., as more fully set forth hereinafter, was also a significant source of financing for petitioner's real estate ventures. The types of loans include working capital loans, land loans (loans used to finance the acquisition and holding of real property until development could occur), interim financing or construction loans (loans during the period of the construction of the projects), and long-term permanent financing (loans with long-term repayment programs).

By 1967, Trammell Crow had become one of the largest real estate developers in the United States and during 1967–70 his real estate business continued to experience rapid growth.

Eastdil Realty, Inc. (Eastdil), is a large real estate investment banking firm whose principal business activity involves obtaining long-term financing for real estate developers and real estate projects. During the years 1967–70, Eastdil was a wholly owned subsidiary of Eastman Dillon Union Securities & Co. (Eastman Dillon), a large investment banking partnership in New York, N.Y. During 1967–70, Eastdil was an important source of financing for petitioner's real estate business and petitioner was one of Eastdil's principal clients. In addition to the financing for numerous apartments and warehouses, petitioner used the services of Eastdil in financing

his Embarcadero Project in San Francisco, a major project consisting of a large group of buildings including hotels, office buildings, and other structures.

During May 1967, Eastman Dillon purchased in a private placement some 300,000 or 330,000 shares of stock of Bankers National Life Insurance Co. (Bankers National). That company was a medium-sized life insurance company based in Morristown, N.J. Eastman Dillon sold some 100,000 of those shares to a group of investors which it had organized. An important objective in the acquisition of the shares of Bankers National was their potential enhancement in value as the result of a merger which Eastman Dillon thought it might be able to bring about. The stock of Bankers National was publicly traded and the amount of stock held by Eastman Dillon and its associated group was regarded as being of sufficient magnitude to constitute effective control over Bankers National.[2]

Petitioner was not included in the group of investors that thus became owners of a portion of the block of stock purchased by Eastman Dillon. However, on a subsequent occasion, John Booth, a partner in Eastman Dillon and chairman of the board of Eastdil, told petitioner of Eastman Dillon's investment in Bankers National, and suggested that petitioner might want to consider acquiring a stock position in Bankers National. In the light of his ongoing discussions with petitioner concerning sources of money, Mr. Booth indicated the possible usefulness of such a stock position as an aid to the development of "some kind of a relationship" with Bankers National. Besides using the services of Eastdil for financing, petitioner occasionally purchased stock of new issues of emerging companies for investment purposes through and upon recommendation of Eastman Dillon. Such purchases were generally not in excess of about $25,000 per purchase.

Robert Glaze, chief financial officer of the Trammell Crow organization during the years 1967–70, was aware of Mr.

---

[2]There is some confusion in the record as to the percentage of stock held by Eastman Dillon and its group. There is evidence that there were about 1,600,000 shares outstanding. Yet there is other evidence that Eastman Dillon and its group held about one-third of the outstanding shares. However, regardless of which of these seemingly inconsistent figures is accurate, there is no dispute that Eastman Dillon and its group had or expected to have effective control over Bankers National.

Booth's suggestion. In his judgment, the purchase of a substantial amount of Bankers National stock by petitioner's organization might be not only a means of opening a new source of loans but also a good investment.

In the fall of 1967, petitioner visited John Brundige, the president of Bankers National. The record does not disclose what was discussed by them. Subsequently, in November 1967, petitioners purchased 24,900 shares of Bankers National stock in the open market for $821,934. Petitioners received an aggregate of 3,874 additional shares of Bankers National stock as stock dividends in September 1968 and October 1969.

Petitioner unsuccessfully attempted to obtain financing from Bankers National in the period following his purchase of Bankers National stock. Although there are indications in the record of two such efforts on behalf of petitioner, the record fails to show when the last such effort was made and when it became apparent that a lending relationship with Bankers National would probably never develop. Meanwhile, at some undisclosed time prior to December 1970, after it became clear that the anticipated favorable merger involving Bankers National would not take place,[3] Eastman Dillon and its group of investors disposed of their stock in Bankers National.

In a memorandum from Mr. Glaze to petitioner dated December 21, 1970, Mr. Glaze expressed his belief that none of the original business reasons for purchasing and holding the Bankers National stock continued to exist at that time in view of the fact that Eastman Dillon and its group of investors no longer owned the stock, and that, in light of the unsuccessful attempts to obtain loans from Bankers National, there was no reason to expect Bankers National to be a source of funds. Mr. Glaze also stated in the memorandum that originally Eastman Dillon was going to monitor petitioner's investment in Bankers National along with its own, but that Eastman Dillon no longer owned stock in Bankers National, and "left us holding our block of stock, much to our detriment."

On December 29, 1970, petitioners sold their total holdings

---

[3] The evidence in respect of the merger is vague and confusing. There is a suggestion that some merger may have taken effect, but the indications are that it was not the merger involving Bankers National which Eastman Dillon had in mind when it acquired the stock of Bankers National.

of 28,774 shares of Bankers National stock for $303,242. Their basis in those shares was $821,934 and they thus realized a loss in the amount of $518,692 on the sale. The proceeds received from the sale of the stock were utilized elsewhere in petitioner's real estate business.

Ownership by petitioners of the Bankers National stock did not influence the financial relationship between petitioner and Eastdil.

During the years 1967 through 1970, Lomas & Nettleton Financial Corp. (Lomas & Nettleton) and the First National Bank in Dallas, as previously noted, were the principal lenders that financed petitioner's business ventures. Petitioner was one of the original organizers of Lomas & Nettleton and during some years was a member of its board of directors. Petitioner owned stock in Lomas & Nettleton (or its predecessor corporation) as early as December 31, 1960, when he acquired 3,000 shares, and over the years acquired and sold various quantities of the stock, realizing both gains and losses on such transactions. His acquisitions and sales of Lomas & Nettleton stock over the period December 31, 1960, through August 26, 1979, are summarized in the following table.

| Number of shares acquired | Date acquired | Number of shares sold | Date sold | Gain or (loss) | Total number of shares owned after acquisition or sale |
|---|---|---|---|---|---|
| 3,000 | Dec. 31, 1960 | | | | 3,000 |
| 1,875 | May 11, 1964 | | | | 4,875 |
| 7,992 | June 1967 | | | | 12,867 |
| 10,700 | July 20, 1967 | | | | 23,567 |
| 77,366 | July 1968 | | | | 100,933 |
| | | 7,500 | June 14, 1968 | $7,968.75 | 93,433 |
| 120,702 | Dec. 31, 1968 | | | | 214,135 |
| | | 7,500 | July 17, 1969 | 8,025.87 | ¹206,635 |
| 150,000 | July 15, 1969 | | | | ¹356,635 |
| | | 11,000 | Jan. 27, 1970 | (64,320.00) | 345,635 |
| | | 30,000 | Apr. 6, 1970 | (150,000.00) | 315,635 |
| | | 50,000 (6 sales) | April 1971 | 654,375.00 | 265,635 |
| | | 25,000 (2 sales) | April 1975 | ? | 240,635 |
| | | 100,000 | May 1975 | ? | 140,635 |
| | | 3,000 | Mar. 19, 1976 | ? | 137,635 |

| 45,000 | Oct. 5, 1978 | | 182,635 |
| | 35,000 | Aug. 26, 1979 | ? | 147,635 |

[1] The figures in this table are taken directly from Exhibit K in evidence. There appears to be an inconsistency in respect of the purchase and sale on July 15, 1969, and July 17, 1969, in that the 7,500 shares sold on July 17, 1969, were subtracted from total number of shares being held prior to the addition of the 150,000 shares purchased on July 15, 1969. The explanation may perhaps lie in differences between trade dates and settlement dates.

Lomas & Nettleton, its affiliate Lomas & Nettleton Mortgage Investors, and a subsidiary, Lomas & Nettleton Co., were all extensively involved with petitioner and his partners across the country during the years 1967 through 1970. Petitioner's organization was the single largest client of the Lomas & Nettleton group during those years as well as during the years that followed. The Lomas & Nettleton group provided short-term and long-term financing for various of petitioner's real estate properties. Specifically, Lomas & Nettleton provided to petitioner, as it has provided to other developers, land acquisition financing, development financing for the installation of streets and utilities, construction financing, and occasional equity financing normally in the form of short-term second mortgage loans. It also placed long-term permanent financing on real estate properties. During the period of 1969 through 1974, the Lomas & Nettleton group extended credit to petitioner in excess of $225 million and placed permanent loans for petitioner with its institutional investors in excess of $150 million.

During 1969, the mortgage servicing portfolio of Lomas & Nettleton totaled $2.25 billion, and in 1970, totaled over $3 billion. In 1970, it had capital resources of approximately $50 to $60 million and total resources of approximately $300 to $400 million. Since Lomas & Nettleton also controlled Lomas & Nettleton Mortgage Investors, which had capital resources of approximately $100 million and total resources of approximately $400 million during 1970, Lomas & Nettleton controlled in the aggregate some $700 to $800 million in total resources during 1970.

In the spring or early summer of 1969, Jess Hay, chief executive officer and president of Lomas & Nettleton from 1967 until the fall of 1969 and chairman and chief executive officer thereafter, became aware that a large block of Lomas & Nettleton stock (150,000 shares) was going to be put on the market as the result of a certain corporate reorganization. Mr.

Hay was concerned that this large block of stock might fall into unfriendly hands. He advised petitioner of the availability of the stock and suggested that it would be appropriate, and in the interest of Mr. Hay and Lomas & Nettleton, for petitioners to purchase the stock. Mr. Hay was concerned with the importance of a stable basis of local shareholders for Lomas & Nettleton and was therefore interested in this block remaining in "friendly hands."

Petitioner acquired the block of 150,000 shares of Lomas & Nettleton on July 15, 1969, for $2,362,500 ($15.75 per share). He thus increased his holding of 206,635 shares (as shown in the table *supra* p. 546) to 356,635 shares. The following are the reported bid and asked prices for the Lomas & Nettleton stock as traded on the over-the-counter market at the dates indicated:

|              | Bid    | Asked   |
|--------------|--------|---------|
| July  1, 1969 | 11     | 11¾     |
| July 10, 1969 | 11     | 11¾     |
| July 11, 1969 | 10½    | 11      |
| July 14, 1969 | 9¾     | 10½     |
| July 15, 1969 | 9      | 10      |
| July 16, 1969 | 9      | 10      |
| July 17, 1969 | 9¾     | 10¼     |
| July 18, 1969 | 9¾     | 10¼     |
| July 31, 1969 | 8½     | 9       |

On or about January 27, 1970, petitioners sold 11,000 shares of Lomas & Nettleton stock for $108,930 and on April 6, 1970, sold an additional 30,000 shares of Lomas & Nettleton stock for $332,500. Petitioners attributed all of these 41,000 shares to the 150,000-share block which had been acquired on July 15, 1969, and the 41,000 shares were thus treated as having an allocated basis of $645,750 ($15.75 per share). As a result, petitioners realized a loss upon the sales of the 41,000 shares during 1970 in the amount of $214,320. Including the losses resulting from these two sales in 1970, petitioner realized a net gain between December 31, 1960, and April 1971 in the

amount of $456,049.62 as the result of 10 separate sales of an aggregate of 106,000 shares of Lomas & Nettleton stock.[4] He made five other separate sales of an aggregate of 163,000 shares of Lomas & Nettleton stock during the period April 1975 through August 26, 1979, but the record does not show the amount of gain or loss realized on such trades.

The proceeds from the 1970 sales of the 41,000 shares of Lomas & Nettleton stock were used elsewhere in petitioner's real estate business. Petitioner retained a substantial holding of Lomas & Nettleton stock (315,635 shares) after the sale of the 41,000 shares. Lomas & Nettleton continued to provide petitioner with financing after 1970.

Petitioner neither received nor expected to receive loans from Lomas & Nettleton on terms more favorable than those extended to similarly qualified borrowers who were not shareholders of Lomas & Nettleton. However, a friendly relationship with the management of Lomas & Nettleton was a matter of considerable importance to petitioner in facilitating the acquisition of needed financing for projects sponsored by his organization. The sales of the 41,000 shares did not adversely affect petitioner's business relationship with Mr. Hay.

Petitioner listed the following stocks in his respective "Statement[s] of Business Assets and Liabilities" as of December 31, 1968, December 31, 1969, and December 31, 1970:

### As of Dec. 31, 1968

| COMMON STOCKS: | SHARES |
| --- | --- |
| Bankers National Life Insurance Co | 26,767 |
| Campbell Taggart Associated Bakeries, Inc | 4,200 |
| Chase Manhattan Bank | 5,600 |
| Computer Leasing Co | 28,167 |
| Docutel Corp | 680 |
| First National Bank in Dallas | 6,077 |
| First Worth Corp | 20 |
| Fort Worth National Bank | 100 |
| Heywood-Wakefield Co | 495 |
| Ideal Toy Corp | 200 |
| Lomas & Nettleton Financial Corp | 206,143 |

---

[4]The figures and date appearing in this sentence (as well as in the following sentence) of the text as to the sales and gains or losses are derived from the table *supra* p. 546.

Recognition Equipment Inc ........................ 6,800
Scientific Control Corp ............................ 50
Southern Industries Corp .......................... 500
TCO Industries, Inc ................................. 92,950
Techno-Growth Capital Corp ...................... 756
Wells Fargo Bank .................................. 5,000

## As of Dec. 31, 1969

| COMMON STOCKS: | SHARES |
|---|---|
| Bankers National Life Insurance Co ............ | 28,774 |
| Campbell Taggart Associated Bakeries, Inc ... | 4,800 |
| Children's World, Inc .............................. | 40,000 |
| Corporation S Co ................................... | 309 |
| Dixie Chemtech, Inc .............................. | 22,500 |
| Docutel Corp ........................................ | 680 |
| Earth Resources Co ................................ | 200 |
| First National Bank in Dallas .................... | 8,184 |
| First Worth Corp ................................... | 20 |
| Gifford-Hill & Co., Inc ........................... | 37,500 |
| Heywood-Wakefield Co ............................ | 495 |
| Ideal Toy Corp ..................................... | 200 |
| Lomas & Nettleton Financial Corp .............. | 356,635 |
| Lomas & Nettleton Mortgage Investors ........ | 1,000 |
| NCS Computing Corp .............................. | 54,663 |
| Recognition Equipment Inc ....................... | 6,800 |
| Scientific Control Corp ............................ | 50 |
| Southern Industries Corp .......................... | 2,000 |
| Techno-Growth Capital Corp ...................... | 750 |
| The Chase Manhattan Corp ....................... | 8,400 |
| The Fort Worth National Bank ................... | 110 |
| University Computing Co .......................... | 5,217 |
| Wells Fargo & Co .................................. | 5,000 |

## As of Dec. 31, 1970

| COMMON STOCKS: | SHARES |
|---|---|
| Campbell Taggart Associated Bakeries, Inc ... | 8,800 |
| Chemtech Industries, Inc ......................... | 22,500 |
| Children's World, Inc .............................. | 20,000 |
| First National Bank in Dallas .................... | 8,184 |
| Gifford-Hill & Co., Inc ........................... | 37,500 |
| Heywood-Wakefield Co ............................ | 495 |
| Lomas & Nettleton Financial Corp .............. | 315,635 |
| Lomas & Nettleton Investors .................... | 1,000 |
| NCS Computing Corp .............................. | 76,663 |
| Recognition Equipment Inc ....................... | 6,800 |

| | |
|---|---|
| Southern Industries Corp ........................... | 2,000 |
| Techno-Growth Capital Corp ...................... | 756 |
| The Chase Manhattan Corp ....................... | 8,400 |
| The Citizens & Southern National Bank ...... | 500 |
| University Computing Co ........................... | 2,700 |
| Wells Fargo & Co .................................... | 5,000 |
| Other miscellaneous common stock ............. | 1,419 |

Petitioner's activities in respect of the Bankers National and Lomas & Nettleton stocks did not represent isolated episodes of securities trading. During the 1968–70 period, petitioner maintained a substantial portfolio of marketable securities, ranging in value from approximately $7 million to some $12.5 million. Though all of these securities were listed as set out above on petitioner's statements of "Business Assets and Liabilities," many of them have not been shown to bear any direct connection to petitioner's real estate business, except that many were pledged as collateral for real estate projects.

The record contains evidence of successful trading in securities. For example, in September of 1967, petitioner invested approximately $150,000 in shares of University Computing, and in July of 1968, some 10 months later, this stock was sold for almost $1,200,000. Other securities were longer-term investments, as for example some 90,000 shares of Transcontinental Bus, which were acquired over a 9-year period and were sold in 1969 at a profit of $4,839,385 on an investment of $1,158,261. Thus, petitioner's investments constituted much more than an inconsequential sideline; the level of activity and the amount of capital placed at risk evidence a substantial endeavor with the potential for significant gains (1968 and 1969) and losses (1970).

### OPINION

Although the deficiencies in question are for the years 1968 and 1969, the controversy between the parties stems from the Commissioner's disallowance of a portion of a net operating loss carryback to those years from 1970. The basis for the Commissioner's disallowance was his determination that losses sustained by petitioners in 1970 upon the sales of shares of stock in certain corporations were "nonbusiness capital losses," and were therefore not deductible in the computation of the net operating loss to the extent that they exceeded the

amount includable on account of "nonbusiness capital gains," in accordance with section 1.172–3(a)(2)(ii), Income Tax Regs. In their petition to this Court, petitioners limited the controversy to losses on sales of stock in four corporations, and at trial and upon brief, they limited it further to losses on sales of stock in only two corporations, Bankers National and Lomas & Nettleton. There is no dispute between the parties that the Commissioner's computation and determination are correct in respect of this issue if the losses now in question were in fact "nonbusiness capital losses" under section 1.172–3(a)(2)(ii) of the regulations.[5] Nor is there any controversy as to the validity of the regulations involved, which were promulgated under the 1954 Code.

Section 172 of the 1954 Code provides in part:

SEC. 172. NET OPERATING LOSS DEDUCTION.

(c) NET OPERATING LOSS DEFINED.—For purposes of this section, the term "net operating loss" means (for any taxable year ending after December 31, 1953) the excess of the deductions allowed by this chapter over the gross income. Such excess shall be computed with the modifications specified in subsection (d).

(d) MODIFICATIONS.—The modifications referred to in this section are as follows:

(1) NET OPERATING LOSS DEDUCTION.—No net operating loss deduction shall be allowed.

(2) CAPITAL GAINS AND LOSSES OF TAXPAYERS OTHER THAN CORPORATIONS.—In the case of a taxpayer other than a corporation—

(A) the amount deductible on account of losses from sales or exchanges of capital assets shall not exceed the amount includible on account of gains from sales or exchanges of capital assets; and

(B) the deduction for long-term capital gains provided by section 1202 shall not be allowed.

(3) DEDUCTION FOR PERSONAL EXEMPTIONS.—No deduction shall be allowed under section 151 (relating to personal exemptions). No deduction in lieu of any such deduction shall be allowed.

(4) NONBUSINESS DEDUCTIONS OF TAXPAYERS OTHER THAN CORPORATIONS.—In the case of a taxpayer other than a corporation, the deductions allowable by this chapter which are not attributable to a taxpayer's trade or business shall be allowed only to the extent of the amount of the gross income not derived from such trade or business. For purposes of the preceding sentence—

(A) any gain or loss from the sale or other disposition of—

---

[5]On the other hand, if the losses are to be classified as "business capital losses," the parties are in agreement as to the amount of carryback permissible under sec. 1.172–3(a)(2)(i), Income Tax Regs., upon which petitioners rely.

(i) property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or

(ii) real property used in the trade or business,

shall be treated as attributable to the trade or business * * *

To the extent involved herein, the controlling regulations relating to the foregoing statutory provisions are set forth in section 1.172–3(a)(2) as follows:[6]

Sec. 1.172–3. *Net operating loss in case of a taxpayer other than a corporation.*

(a) *Modification of deductions.* A net operating loss is sustained by a taxpayer other than a corporation in any taxable year * * * to the extent that, for such year, there is an excess of deductions allowed by chapter 1 of the Internal Revenue Code of 1954 over gross income computed thereunder; * * * In determining the excess of deductions over gross income for such purpose—

\*　　\*　　\*　　\*　　\*　　\*　　\*

(2) *Capital losses.* (i) The amount deductible on account of business capital losses shall not exceed the sum of the amount includible on account of business capital gains and that portion of nonbusiness capital gains which is computed in accordance with paragraph (c) of this section.

(ii) The amount deductible on account of nonbusiness capital losses shall not exceed the amount includible on account of nonbusiness capital gains.

---

[6]Other relevant provisions of sec. 1.172–3(a) of the regulations are contained in sec. 1.172–3(a)(3) as follows:

Sec. 1.172–3(a). *Modification of deductions.* * * *

\*　　\*　　\*　　\*　　\*　　\*　　\*

(3) *Nonbusiness deductions* —(i) *Ordinary deductions.* Ordinary nonbusiness deductions shall be taken into account without regard to the amount of business deductions and shall be allowed in full to the extent, but not in excess, of that amount which is the sum of the ordinary nonbusiness gross income and the excess of nonbusiness capital gains over nonbusiness capital losses. See paragraph (c) of this section. For purposes of section 172, nonbusiness deductions and income are those deductions and that income which are not attributable to, or derived from, a taxpayer's trade or business. Wages and salary constitute income attributable to the taxpayer's trade or business for such purposes.

(ii) *Sale of business property.* Any gain or loss on the sale or other disposition of property which is used in the taxpayer's trade or business and which is of a character that is subject to the allowance for depreciation provided in section 167, or of real property used in the taxpayer's trade or business, shall be considered, for purposes of section 172(d)(4), as attributable to, or derived from, the taxpayer's trade or business. Such gains and losses are to be taken into account fully in computing a net operating loss without regard to the limitation on nonbusiness deductions. Thus, a farmer who sells at a loss land used in the business of farming may, in computing a net operating loss, include in full the deduction otherwise allowable with respect to such loss, without regard to the amount of his nonbusiness income and without regard to whether he is engaged in the trade or business of selling farms. Similarly, an individual who sells at a loss machinery which is used in his trade or business and which is of a character that is subject to the allowance for depreciation may, in computing the net operating loss, include in full the deduction otherwise allowable with respect to such loss.

In general, section 172(d) seeks to trim the more general "excess of the deductions * * * over the gross income" of section 172(c) down to an amount which represents the loss from the current conduct of the taxpayer's trade or business. In obvious recognition of the special role played by capital gains and capital losses (both personal and business related) in our tax system, subsection (d)(2) eliminates net capital losses and the long-term capital gain deduction, both of which may be thought to relate more to isolated transactions than to day-to-day operations. Of more immediate significance in the present controversy, however, is subsection (d)(4), which limits the deduction from activities "not attributable to the taxpayer's trade or business" to the income from such "nonbusiness" sources, with exceptions in respect of certain business assets as will be explained more fully *infra*. In the regulations, these two limitations are in a sense combined to produce the following scheme: "Nonbusiness capital losses" are deductible only to the extent of "nonbusiness capital gains" (sec. 1.172–3(a)(2)(ii)), and "business capital losses" are deductible only to the extent of the sum of business capital gains and the excess of net "nonbusiness capital gains" over net nonbusiness ordinary losses (secs. 1.172–3(a)(2)(i) and 1.172–3(c)).

As already indicated, the pivotal issue is whether the losses sustained on the sales of stock of Bankers National and Lomas & Nettleton are to be classified as "nonbusiness capital losses" under subparagraph (ii) of regulations section 1.172–3(a)(2), as determined by the Commissioner, or whether they qualify as "business capital losses" as argued by petitioners.[7] If they are found to be "nonbusiness capital losses," then they may be taken into account under (ii) only to the extent that they are absorbed by nonbusiness capital gains—a result that would be fatal to petitioners' position. We have already noted that there is no controversy as to the validity of these regulations, and they have in fact recently been held to be a valid interpreta-

---

[7]The importance to petitioners of having these losses classified as "business capital losses" lies in the fact that petitioner had realized large gains in his real estate business during 1970 which became entitled to capital gain treatment under sec. 1231 of the Code rather than being taxed as ordinary income. In the circumstances, it became important to petitioners to treat the losses in question as "business capital losses" so they could be offset against section 1231 gains and thus increase the amount of the 1970 net operating loss based on the totality of petitioner's business operations during that year.

tion of the statute in *Erfurth v. Commissioner*, 77 T.C. 570 (1981). Also, petitioners do not dispute that their stock in Bankers National and Lomas & Nettleton had been acquired and held with a substantial investment purpose and therefore constituted capital assets.[8]

Before we address the essentially factual issue before us— namely, whether the losses sustained upon the 1970 sales of stock in Bankers National and Lomas & Nettleton were in fact "business capital losses" or "nonbusiness capital losses" under the regulations—it may be helpful to examine briefly the history and purpose of the underlying statutory provisions and the way in which the pertinent regulations undertake to give effect to the statute. In this regard, we note at the outset that neither the Internal Revenue Code nor the regulations define these terms.

Section 172 of the 1954 Code, patterned to a considerable extent after sections 23(s) and 122 of the 1939 Code, contains a comprehensive and complicated set of provisions allowing a "net operating loss deduction" based upon carrybacks and carryovers of "net operating losses" sustained in specified years before and after the taxable year. The general purpose of these provisions was "to ameliorate the unduly drastic conse- quences of taxing income strictly on an annual basis. They were designed to permit a taxpayer to set off its lean years against its lush years, and to strike something like an average taxable income computed over a period longer than one year." *Libson Shops, Inc. v. Koehler*, 353 U.S. 382, 386 (1957). Cf. *United States v. Foster Lumber Co.*, 429 U.S. 32, 42–43 (1976). And in explaining a change made by the 1954 Code relating to the expansion of the span of years over the period provided in prior law during which a net operating loss may be carried

---

[8]Cf. *W. W. Windle Co. v. Commissioner*, 65 T.C. 694 (1976), appeal dismissed 550 F.2d 43 (1st Cir. 1977), cert. denied 431 U.S. 966 (1977); *Corn Products Co. v. Commissioner*, 350 U.S. 46 (1955); Rev. Rul. 78–94, 1978–1 C.B. 58.

However, petitioners make it clear that they would be equally satisfied if their stock holdings in these two corporations were classified as noncapital assets, since the losses in question would then be ordinary losses and would not be subject to the restrictions of subparagraph (ii) of the regulations. Nevertheless, they do not argue the point, and we do not regard it as being before us, except to the extent that it may become involved in connection with the Government's contingent alternative issue in which it seeks to tax certain gains on other securities in 1968 and 1969 as ordinary income in the event that it loses on the main issue.

back and carried forward, the House Ways and Means Committee emphasized the legislative objective of "improv[ing] the equity of the tax system as between businesses with fluctuating income and those with comparatively stable incomes." H. Rept. 1337, 83d Cong., 2d Sess. 27 (1954). See also H. Rept. 855, 76th Cong., 1st Sess. 9 (1939), 1939–2 C.B. 504, 510–511.

As the very term "net operating loss" itself suggests, the statute was aimed at giving relief in cases involving the operation of a business. And in keeping with that purpose, the 1939 Code explicitly limited the computation of the net operating loss carryback in respect of the part played by deductions "not attributable to the operation of a trade or business regularly carried on" by the individual taxpayer. This Court focused on that language in *Sic v. Commissioner*, 10 T.C. 1096 (1948), affd. 177 F.2d 469 (8th Cir. 1949), cert. denied 339 U.S. 913 (1950), in holding that a loss sustained by a farmer in selling a portion of his land was not a loss attributable to the "operation" of the business of farming "regularly carried on" by him.[9] Although the loss was in a sense associated with the farmer's business, it was not one of the items needed to be taken into account in smoothing out the peaks and valleys resulting from the annual accounting required in connection with the regular year to year operation of the farming business. The result thus reached in *Sic* was in accord with language approved by the Supreme Court in a comparable but nevertheless somewhat different context in *Dalton v. Bowers*, 287 U.S. 404, 407–409 (1932), which made specific reference to "occasional or isolated losses" in contrast to losses incurred by persons in an established business where the legislative objective was to equalize taxation between profitable and unprofitable years.

Although there was thus much force to the reasoning of *Sic* in view of the perceived legislative purpose in respect of the provisions in the 1939 Code, Congress manifested a different intention when the 1954 Code was adopted. Both the House

---

[9]See also *Merrill v. Commissioner*, 9 T.C. 291 (1947), affd. 173 F.2d 310 (2d Cir. 1949); *Lazier v. United States*, 170 F.2d 521 (8th Cir. 1948); *Luton v. Commissioner*, 18 T.C. 1153 (1952); *Baruch v. Commissioner*, 11 T.C. 96 (1948), affd. per curiam 178 F.2d 402 (2d Cir. 1949); *Pettit v. Commissioner*, 175 F.2d 195 (5th Cir. 1949), affg. a Memorandum Opinion of this Court; but see *Goble v. Commissioner*, 23 T.C. 593 (1954).

Ways and Means Committee and the Senate Finance Committee, in identical language, referred explicitly to the *Sic* case, and clearly indicated that the change in law which they recommended would permit individuals to include any loss sustained on the sale of "a business or certain business assets" as part of the net operating loss for the year of sale.[10] The language of the 1939 Code relied upon in *Sic* —"not attributable *to the operation* of a trade or business *regularly carried on*"—was in fact changed in the 1954 Code as recommended by the committees, so as to eliminate the underscored words. As thus modified, the reenacted provisions contained in section 172(d)(4) of the 1954 Code, *supra* p. 552, now speak of deductions which are "not attributable to a taxpayer's trade or business." However, that language related generally to deductions of any kind, and a further provision was added to deal specifically with the problem presented by *Sic*. In that connection, a subparagraph (A) was added to section 172(d)(4), which explicitly states that for purposes of the sentence containing the general language quoted above—

    (A) any gain or loss from the sale or other disposition of—
      (i) property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or
      (ii) real property used in the trade or business,
shall be treated as attributable to the trade or business.[11]

In sum, what we have in the 1954 Code is general language that still requires that the loss for purposes of the modifications in section 172(d)(4) must be "attributable" to a taxpayer's trade or business; the word "operating" is still part of the very term ("net operating loss") involved throughout section 172;

---

[10]See H. Rept. 1337, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. A56-A57; S. Rept. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. 212–213 (1954):

"A further substantive change will permit taxpayers other than corporations who sell a business or certain business assets in effect to include any loss sustained on the sale of such business or business assets as part of a net operating loss for the year of the sale. (Corporations are entitled to this treatment under present law and under this section.) Thus, subsection (d)(4)(A) will overrule the decision in *Joseph Sic v. Commissioner*, (10 T.C. 1096, 177 F. (2d) 649 (CA–8), certiorari denied, 339 U.S. 913), and similar cases, which held, for example, that a farmer who sold his farm at a loss could not include such loss as part of his net operating loss. The cases indicated that such loss was a nonbusiness loss since the taxpayer was not in the business of selling farms. The new provisions will reach the opposite result."

[11]See also sec. 1.172–3(a)(3), Income Tax Regs., quoted in note 6 *supra*.

and the specific words overruling *Sic* articulate a very narrowly circumscribed class of losses relating only to sales of depreciable property used in a trade or business or sales of real property similarly used, which are plainly not involved herein. To be sure, the Commissioner has ruled that the two categories specified in section 172(d)(4)(A)—depreciable property and real estate—are not necessarily exclusive of other assets that may qualify as being "attributable to a taxpayer's trade or business," such as accounts receivable acquired in the ordinary course of trade or business. Rev. Rul. 57–563, 1957–2 C.B. 175. However, it seems plain that the new provisions do not establish a wide open field for any kind of asset to qualify as a business asset merely because it may have some connection with a taxpayer's trade or business.

There is no dispute that under the governing statutory provisions the loss must be "attributable to" the taxpayer's trade or business. Nor is there any dispute that the pivotal terms of the regulations—"business capital losses" and "nonbusiness capital losses"[12] —must be read in the light of the statutory phrase "attributable to." The Government contends that in order to qualify as a "business" asset in this context, the property in question must have a "real nexus" to the taxpayer's business. The petitioners propose as the test that the property must be "directly related" to the taxpayer's business. Notwithstanding that these two tests are differently phrased, petitioners state that they are essentially the same. We agree. Accordingly, since petitioners' shares of stock in Bankers National and Lomas & Nettleton are concededly neither depreciable property nor real estate so as to fall within the specific legislative change wrought by section 172(d)(4)(A) of the 1954 Code, we proceed to consider whether they are factually so "directly related" or have a sufficiently close "nexus" to Trammell Crow's real estate business as to justify classifying the losses on sale as "business capital losses."

---

[12]Although these terms are contained in sec. 1.172–3(a)(2) of the regulations promulgated under the 1954 Code, they also appeared in identical context in predecessor regulations under the 1939 Code. See sec. 39.122–3(a)(4), Regs. 118 (1953). The same critical statutory language—"attributable to" a taxpayer's trade or business—is present in both the 1939 Code and the 1954 Code. And we have held that in carrying over the pertinent regulations of the 1939 Code to the regulations under the 1954 Code there was no failure to reflect any "affirmative change in congressional policy." *Erfurth v. Commissioner*, 77 T.C. at 574.

As a preliminary aspect of this factual inquiry, we will dispose of one factor that might otherwise be considered highly significant in determining whether these securities are business capital assets, namely, their availability as collateral for loans that petitioner might seek for use in his real estate business. Petitioners placed much emphasis on this point during the earlier stages of the case. However, they do not argue it on brief, and apparently with good reason, for it may prove too much. Any asset can be used as collateral, even one's home, but this circumstance hardly makes it a business asset. And quite likely, petitioners must have been aware of the danger of such an argument when considered in the light of the Government's contingent alternative contention that seeks to tax large gains on sale of other securities in 1968 and 1969 as ordinary income rather than capital gain where the only real basis for such contention is the classification of such securities as "business" assets on petitioner's books largely because they were used or available for use as collateral for loans in petitioner's real estate business.

*Bankers National.*—Petitioners purchased some 25,000 shares of Bankers National stock in November 1967 at a cost of $821,934. The purchase was made as a result of a suggestion by John Booth, chairman of the board of Eastdil and a partner in its sole stockholder, Eastman Dillon. Eastman Dillon and a group of investors organized by it had then recently acquired a controlling interest in Bankers National that was obviously expected to be a profitable investment. Mr. Booth was familiar with petitioner's interest in developing sources of funds for his real estate projects, and suggested that petitioner might want to consider "some kind of a relationship" with Bankers National.

Contrary to petitioner's contention, we do not find convincing evidence in the record that one of the reasons motivating the purchase of the stock was his desire to consolidate or further his business relations with Eastdil. Indeed, the record strongly indicates that it was a matter of no real concern to Eastdil whether or not petitioner purchased the stock, and we do not credit petitioner's largely conclusory testimony that one of the reasons he purchased the stock was to further his existing business relations with Eastdil. The record shows that petitioner already had a firm business relationship with

Eastdil, and nothing in the evidence gives convincing support to the conclusion that a person of Mr. Crow's intelligence, in the circumstances revealed by the record, felt any strong need to please Eastdil by purchasing the stock or that he really even thought that he was expected to purchase it. As we view the evidence, Mr. Booth was simply calling petitioner's attention to a potentially profitable investment which at the same time might perhaps open the door to a possible future source of funds.

It is true that petitioner visited the president of Bankers National before purchasing the stock, but the record is utterly devoid of any evidence as to what was discussed by them, or whether anything occurring at that meeting was in any way linked to establishing or even attempting to establish a business lending relationship with petitioner's real estate operations. Moreover, the record contains virtually no evidence relating to any specific attempts to obtain loans from Bankers National after the purchase of the shares, apart from petitioner's general testimony about two unidentified attempts, which were apparently the ones referred to in a December 21, 1970, memorandum of Robert Glaze. The first of the two incidents thus referred to was an unsuccessful effort by someone named Frank Carter "to make a deal with Chuck Curtis, Financial Vice President of Bankers." As to the second, Glaze stated that he "remember[ed] also that Bart [unidentified] had conversations with them about prospects of a loan and never got to first base." Nothing in the record tells us when these two unsuccessful efforts were made, or how much time elapsed between the last such effort and petitioner's sale of the Bankers National stock in late December 1970.

For aught that appears, that failure to get "to first base" was the last such effort and that may have occurred at least a year or two prior to the December 1970 sale—a circumstance that would strongly support the conclusion that petitioners were holding on to their stock in Bankers National largely because of its profitable investment potential. Petitioners have failed to persuade us otherwise. The evidence indicates that Eastman Dillon was going to "monitor" the stock for petitioners along with its own investment in Bankers National, and when Eastman Dillon disposed of its holdings, petitioners in effect were left stranded.

True, when petitioners finally sold the stock in December 1970, there was recognition of the fact that Bankers National had not turned out to be a source of loans, but the record is equally consistent with the view that the overriding consideration in the purchase of the stock was the prospect of substantial investment gains, and that the possible usefulness of stock ownership as an aid to obtaining loans from Bankers National was only of peripheral significance. We certainly do not find on this record the necessary "direct" relationship or "real nexus" between ownership of the stock and its perceived usefulness as a source of funds for petitioner's real estate business.

Petitioner had an extensive portfolio of investment securities shown to have ranged from at least some $7 million to over $12 million. He had made substantial profits on some of his holdings. Petitioner has not persuaded us that his purchase and holding of the Bankers National stock was "directly" related to his real estate business, or that it represented anything other than a part of his investment portfolio coupled with an *indirect* possibility that it might be helpful to him in obtaining funds for his real estate business. The burden of proof was upon him, and in our judgment, it has not been carried in respect of this block of stock. We are not required to indulge in speculation as to possible facts or circumstances that would add weight to his position. If there are any such facts or circumstances—and we can imagine many—that might give greater substance to his position, it was his obligation to bring them forth. On the present state of the record we find against him.

The factual conclusion that we thus reach is wholly in accord with the legislative history described above, pp. 555–558. That history indicates that the changes made in section 172(d)(4) in overruling the *Sic* case were done with surgical precision so as to provide for the explicit classification of only a narrow range of assets as "attributable to a taxpayer's trade or business," thus retaining the basic concept that only *business* losses are permitted to be carried to other years. And although the types of property explicitly identified in that narrow range of assets may not be exclusive, the business relationship must nevertheless be clearly established. We have accepted petitioner's suggested standard for applying the

statute, i.e., that the asset must be "directly related" to the taxpayer's business, but we reject on this record his contention that the purchase and holding of the Bankers National stock were so related.

*Lomas & Nettleton.*—We reach a different conclusion in respect of the losses sustained upon the January 27, 1970, and April 6, 1970, sales of 11,000 shares and 30,000 shares, respectively, of Lomas & Nettleton out of the 150,000-share block purchased on July 15, 1969. We find that such losses were "directly related" to petitioner's real estate business.

Unlike Bankers National, Lomas & Nettleton was a fully established key financial resource for petitioner in a business in which the availability of financing was a critical determinant of success or failure of the operations of his organization. Moreover, as appears in our findings, petitioner's organization was the single largest client of the Lomas & Nettleton group. These considerations alone, however, would not be sufficient to justify characterizing ownership of stock in Lomas & Nettleton as directly related to petitioner's business. For the record shows that petitioner had an extensive portfolio of securities, including stock in Lomas & Nettleton, and that he bought and sold stock in Lomas & Nettleton in a manner that, so far as this record discloses, was not different from his trading in other securities. If this were all there were to the matter, we would find in favor of the Government. However, the block of 150,000 shares out of which the sales in issue were made stands on a different footing.

In the spring or early summer of 1969, Mr. Hay, the chief executive officer of Lomas & Nettleton, alerted petitioner to the fact that a 150,000-share block would soon be placed on the market. He communicated to petitioner his concern that this block might find its way into unfriendly hands. In view of the crucial role that Lomas & Nettleton played in the success of petitioner's business, it does not require a great stretch of the imagination to see the importance to petitioner's business of having this block of stock remain in "friendly" hands. Of particular significance in this connection is the fact that petitioner paid $15.75 per share for this block of stock on July 15, 1969, when Lomas & Nettleton stock was selling that day on the market at bid and asked prices of $9 and $10, respectively. Indeed, during the entire month of July, the low

bid price was 8½ and the highest asked price was 11¾. We have no doubt that this was no ordinary purchase of stock for investment purposes, notwithstanding that petitioner undoubtedly had some investment motive in the acquisition. We are persuaded that his overriding concern, in the circumstances of this case, related "directly" to his real estate business.

Our finding that the acquisition of the 150,000-share block was directly related to petitioner's business, however, is not the end of the matter. The original purpose can change in the course of time, and a loss sustained after the lapse of a long period of time, when it might no longer be necessary to maintain this block intact to keep it out of unfriendly hands, may indeed indicate that the stock was being held for investment purposes, like other shares of Lomas & Nettleton. However, the sale of the 11,000 shares was made only some 6 months after purchase and the sale of the 30,000 shares was made only about 2½ months after the first sale. In the circumstances, we are satisfied that total lapse of somewhat less than 9 months was not so long as to indicate a change in purpose, and that by fragmenting the original 150,000-share block in this manner, petitioner was acting consistently with the original objective in the acquisition of these shares. We express no opinion as to the proper treatment of the disposition of the remaining 109,000 shares in a later year or years.

*The Commissioner's alternative issue.*—In his answer, the Commissioner proposed increased deficiencies based upon treating as ordinary income, rather than capital gain, profits realized by petitioner in 1967, 1968, and 1969 on sales of stock in various other corporations. The Government makes it clear that this issue is raised only on a contingent basis, and it presses it only if we should decide the Bankers National and Lomas & Nettleton issues against it. Since we have decided these issues differently, it is not clear whether the Government's alternative issue is still in controversy. In any event, we decide it against the Government.

In the first place, the burden of proof in respect of this issue is on the Government since it was raised for the first time in its answer. And that burden certainly has not been carried here. The only evidence of substance in the record in support of the Government's position is that the securities in question,

like the stock in Bankers National and all of petitioner's holdings in Lomas & Nettleton, were listed in petitioner's "Statement[s] of Business Assets and Liabilities" for the years involved, and that such securities were available for use as collateral by petitioner in connection with loans for his real estate business. Neither of these circumstances is sufficient to convert capital gain into ordinary income. We have already held in the case of the Bankers National stock, where these circumstances were present,[13] that the shares were not held in such manner as to render the loss a "business capital loss," and plainly even more rigid criteria would have to be taken into account to characterize the gains involved in the alternative issue as *ordinary* income. Nor does the fact that the securities may have been used as collateral in a business context convert them into business assets. We have already pointed out that although one's home can be put up as collateral to finance a loan obtained for a business purpose, this would hardly justify classifying the home as a business asset. See *supra* p. 559. We hold that the Government has not carried its burden of proof in respect of the alternative issue.[14]

*Decision will be entered under Rule 155.*

---

[13]Similarly, these circumstances were present in the case of the Lomas & Nettleton stock, but they played no part in our conclusion in respect of that stock.

[14]Although we decide this issue against the Government, we do not agree with petitioner's characterization of it as frivolous, since petitioners themselves in the early stages of this controversy relied upon the two considerations discussed above as being relevant to the main issue raised by them. To be sure, they have either abandoned reliance upon them, or at least have placed but very little reliance upon them, and the Government can hardly be faulted for attempting to make something out of them in the event that they might prove to be of significance in a possible decision in petitioners' favor.