## HUGHES, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10741-84.        Filed January 4, 1988.

*Charles H. Egerton* and *Paul Mandelkern,* for the petitioner.

*John S. Winkler,* for the respondent.

WHITAKER, *Judge:* In a statutory notice of deficiency dated January 20, 1984, respondent determined the following deficiencies in petitioner's Federal income tax:

| TYE Dec. 31— | Amount |
|---|---|
| 1979 | $24,530 |
| 1980 | 21,049 |
| 1981 | 33,652 |

The issue for decision is whether petitioner is liable for the accumulated earnings tax imposed by section 531.[1]

---

[1]All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

1

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Petitioner is a Florida corporation whose principal place of business is and has been in Orlando, Florida.

Petitioner's sole shareholders upon incorporation were Russell S. Hughes, Harry C. Hughes, and Romania S. Hughes. In 1959, Romania S. Hughes transferred all of her shares in petitioner to Russell S. Hughes and Harry C. Hughes, brothers, so that each then held 50 percent of petitioner's stock. On December 18, 1973,[2] the Hughes brothers transferred their shares of petitioner's stock in equal portions to their sons. Thereafter, and throughout the years in issue, the company was owned equally by David H. Hughes, Vincent S. Hughes, Russell V. Hughes, and Sun First National Bank of Orlando (through its nominee FABCO Co.) as trustee for Donald Richard Hughes.

During the years in issue the officers of petitioner were:

> Russell V. Hughes, president
> Vincent S. Hughes, vice president
> David H. Hughes, secretary/treasurer

From its inception and throughout the years in issue, petitioner was engaged in the trade or business of owning and leasing improved real and tangible personal properties. Petitioner was involved mainly in leasing warehouses and other facilities throughout the State of Florida. Its primary lessee of these facilities was Hughes Supply, Inc. (Hughes Supply), a wholesale distributor of electrical, plumbing, and industrial fixtures and supplies to the building and mechanical trades.

During the years in issue, petitioner leased 16 separate parcels of improved real property to Hughes Supply. The revenue from these leases was approximately 80 percent of petitioner's revenue during those years. The leased properties included executive offices, branch facilities (warehouses, sales and administrative offices, and parking and storage areas), a utility warehouse, and a garage and trucking terminal. Petitioner also leased a facility to Southern

---

[2] The parties stipulated that the transfer took place on Dec. 18. We note however that in petitioner's statement to respondent for purposes of sec. 534(c) the date of transfer was Dec. 16.

Lighting Mfg. Co., a wholly owned subsidiary of Hughes Supply. A typical facility was 20,000 to 30,000 square feet, with an area of 1 to 3 times that size in paved parking and outside storage.

Hughes Supply was founded as a general partnership in Orlando, Florida, in 1928. The business was incorporated in 1947, and Russell S. Hughes, Harry C. Hughes, and Romania S. Hughes, who were the sole partners, became the sole shareholders. Russell S. Hughes and Harry C. Hughes held a majority of the stock until the first public offering of 350,000 shares in 1970. Since that time, Hughes Supply has been a publicly held corporation with one class of stock actively traded in the over-the-counter market. The corporation's total net sales exceeded $100 million during each year in issue.

In June 1976, Hughes Supply was notified, pursuant to the requirements of the Securities and Exchange Commission, that 5.6 percent of its outstanding stock had been purchased by the employee retirement plan of Consolidated Electrical Distributors, Inc. (CED), a closely held Delaware corporation whose principal office was in Los Angeles, California.

A Schedule 13D had been filed, as is required to be filed when a person has acquired 5 percent or more of the voting stock of a public company. The Schedule 13D discloses information concerning the identity of the person making the acquisition of the shares, the source of funds used in the acquisition, the number of shares owned, and the purpose for which the acquisition is being made. In the Schedule 13D, the retirement plan indicated that the Hughes Supply stock was acquired for investment purposes.

In subsequent years, CED, its affiliates, and its shareholders acquired and held shares of Hughes Supply stock as follows:

| Date of SEC Schedules 13D and amendments | Number of Hughes Supply shares owned by CED[3] | Total shares outstanding | Percentage owned by CED group |
|---|---|---|---|
| 6/24/76 | 81,200 | [1]1,444,000 | 5.6 |
| 3/30/77 | 130,300 | [1]1,340,822 | 9.7 |
| 6/10/77 | 141,300 | [1]1,345,714 | 10.5 |

[3]This figure includes shares owned by CED affiliates.

| Date of SEC Schedules 13D and amendments | Number of Hughes Supply shares owned by CED[3] | Total shares outstanding | Percentage owned by CED group |
|---|---|---|---|
| 10/07/77 | 180,000 | [1]1,343,283 | 13.4 |
| 11/04/77 | 202,300 | [1]1,339,735 | 15.1 |
| 12/12/77 | 209,300 | [1]1,341,666 | 15.6 |
| 3/08/78 | 227,800 | [1]1,342,368 | 16.97 |
| 11/16/78 | 397,600 | [1]1,351,166 | 29.4 |
| 11/09/79[2] | 620,700 | 2,032,908 | 30.5 |
| 3/07/80 | 628,200 | 2,032,908 | 30.9 |
| 5/30/80 | 646,750 | 2,032,908 | 31.8 |
| 12/22/82 | 655,750 | 2,032,908 | 32.25 |

[1]Approximate number.

[2]As corrected by amended Schedule 13D dated 11/12/79.

As the Schedules 13D were filed, some of the Hughes family members became concerned about whether the acquisitions of stock were merely for investment. CED was a competitor of Hughes Supply in the electrical materials distribution business and was known as a national company that grew primarily through the acquisition of other companies. CED had 11 branches in Florida at the time the Hughes Supply stock was acquired. A takeover by CED threatened the welfare of Hughes Supply which also, in turn, potentially threatened the viability of the leases petitioner held with Hughes Supply.

CED's chairman of the board of directors, Keith Colburn, met with David Hughes several times regarding the stock purchases. At first he told Mr. Hughes that CED bought Hughes Supply stock because it was undervalued. Later, in 1977, Mr. Colburn and his father proposed that the Hughes family join them in taking Hughes Supply private with the two families each owning one-half of the company. The Hughes family rejected this idea.

Hughes Supply's general counsel, Robert Blackford, also a director of the corporation, monitored the stock purchases. When CED's interest exceeded 10 percent of the total stock issued, he discussed responses to a hostile tender offer, such as filing litigation and alleging violations of the antitrust laws. He also advised David Hughes to contact a New York law firm specializing in mergers, acquisitions, and takeovers. In November 1977, David Hughes contacted an attorney in the New York firm. The

attorney met with Mr. Hughes, as president of Hughes Supply, and two financial advisors to discuss the situation. They explained their concerns and the attorney explained to them the "state of play." He addressed generally what things should be considered so Mr. Hughes could determine whether to retain his law firm. Hughes Supply subsequently paid the firm $40,000 as a retainer for their advice in terms of defensive measures.

The attorney reviewed documents provided by Hughes Supply, including its charter, bylaws, annual reports, other public filings, and proxy statements. He also reviewed the CED Schedule 13D filings and other background information he received on CED. Based on this information he concluded that despite reporting that it was making acquisitions for investment, CED was involved in a "creeping acquisition." He found significant the continually increasing stock purchases at increasing price levels, a pattern seen in a creeping acquisition. He also noted that CED had made other acquisitions, they were in a related line of business, and that they were putting a lot of money into one particular situation. These factors were generally not indicative of a passive investment, and he viewed CED as a threat to the control of Hughes Supply.

In December 1977, the attorney met with David Hughes and Mr. Blackford again. He advised them with respect to the paths they could follow in reacting to CED's continuing acquisition of shares. He proposed issuing additional shares of Hughes Supply stock into "friendly hands" to increase capitalization of the company and dilute CED's position; increasing the Hughes' family interest to acquire 51 percent or as close to 51 percent as possible to assure that control would be retained by the family; litigating, i.e., challenging CED's disclosures and preventing future acquisitions; or selling the company to a third party. No action was taken by Hughes Supply that year.

David Hughes met with the attorney for the final time about a year later to discuss the status of the situation, however no further contact was made and the law firm's retainer was not renewed.

Based on the advice obtained, the strategy agreed upon in defense of a takeover was to try to purchase additional shares of Hughes Supply stock from the public sector and

place them in "friendly hands."[4] A number of events took place,[5] including, in January 1979, petitioner's purchase of 43,500 shares of Hughes Supply stock in the following allotments:

| Number of shares | Price per share | Purchase price |
| --- | --- | --- |
| 42,500 | $21 | $892,500 |
| 1,000 | 19 | 19,000 |
| | | 911,500 |

The purchase price was paid with $36,500 of available cash from petitioner, $375,000 borrowed from Sun Bank on a demand note basis, and $500,000 borrowed from Sun Bank on a 10-year note secured by a mortgage on a portion of petitioner's real properties. The 43,500 shares of Hughes Supply stock served as collateral for the demand note.

Petitioner received an additional 21,750 shares of Hughes Supply stock on June 15, 1979, pursuant to a 3-for-2 stock split effective May 15, 1979.

In June and July 1980, petitioner acquired a total of 8,000 additional shares of Hughes Supply stock in three

---

[4]Apparently this further action was not discussed with the New York attorney. In 1980, however, Hughes Supply retained a brokerage firm to advise, among other things, with respect to appropriate courses of action, if any, in response to acquisitions or dispositions of major portions of its stock.

[5]In addition to the purchase of Hughes Supply stock by petitioner, the total number of shares available in a Hughes Supply stock option plan that had been created in 1973 for principal officers and executives was raised from 65,000 to 97,500 in 1978. The number of available shares were increased to 200,000 in 1982. Options to purchase were exercised as follows:

| Fiscal year | Number of shares |
| --- | --- |
| 1973-76 | 0 |
| 1/28/77 | 822 |
| 1/27/78 | 0 |
| 1/26/79 | 11,007 |
| 1/25/80 | 17,857 |
| 1/30/81 | 17,896 |
| 1/29/82 | 34,617 |
| 1/28/83 | 11,808 |

Hughes Supply retired 306,000 shares of its treasury stock in 1980.

In 1981, Hughes Supply adopted a trusteed Employee Stock Ownership Plan (ESOP) to which it issued 30,000 shares of new stock. On Dec. 31, 1981, the ESOP owned 53,769 shares.

In addition, the Hughes Supply Profit Sharing Plan purchased shares of Hughes Supply stock. The plan owned the following shares on the dates indicated:

| Dec. 31— | Number of shares |
| --- | --- |
| 1979 | 78,443 |
| 1980 | 119,122 |
| 1981 | 119,122 |

During 1981, Hughes Supply acquired by merger the Marbut Co., a closely held corporation with eight business locations in Georgia. In connection with the merger, 124,160 new shares of Hughes Supply stock were issued to Marbut Co. stockholders in 1981.

separate transactions for a total purchase price of $141,902. One hundred thousand dollars of the consideration for these purchases was borrowed from Sun Bank and the remaining balance of $41,902 was paid from petitioner's available cash assets.

Fifteen additional shares of Hughes Supply stock were acquired by petitioner on June 4, 1981, for $341.25, bringing the total holdings of Hughes Supply stock to 73,265 shares. These acquisitions, in conjunction with the other increases in stockholdings by "friendly" parties, helped assure that control of Hughes Supply would be retained.

By late 1982, the CED group was satisfied with the return on the Hughes Supply investment. On December 10, 1982, Edmundson International, Inc., a subsidiary of CED which owned the Hughes Supply stock,[6] entered into a stock purchase agreement whereby Hughes Supply redeemed all 655,750 shares of Hughes Supply common stock held by Edmundson for a total purchase price of $16,393,750, or a per share purchase price of $25. The redemption was closed December 29, 1982. Pursuant to the terms of the agreement, Edmundson, for itself and its affiliates, agreed not to purchase in the aggregate, directly or indirectly, 2 percent of any class of equity securities of Hughes Supply within the 5-year period from the closing date.

On January 27, 1983, Hughes Supply's stock underwent another 3-for-2 stock split, increasing the number of shares held by petitioner from 73,265 to 109,897.

On April 15, 1983, Hughes Supply made a public offering of 850,000 shares of its stock. As part of this offering, 75,000 of petitioner's shares of Hughes Supply stock were sold.

### Additional Investments

After the first public offering of its stock, Hughes Supply decided to own directly any new warehouses or other facilities it required rather than lease them from petitioner to avoid any appearance of impropriety. The previous leases

---

[6]Edmundson International, Inc. is a wholly owned subsidiary of CED engaged in the same business. At some point between the Nov. 9, 1979, Schedule 13D filing and the Mar. 7, 1980, Schedule 13D filing Edmundson became the owner of the Hughes Supply stock.

between petitioner and Hughes Supply were maintained in accordance with their terms, and the relationship between the two businesses continued in the same manner. Twelve of the leases were renewed for 10 years in 1978 and two were under 5-year leases from 1978 to 1983. In this respect, petitioner, as lessor, expanded its facilities leased to Hughes Supply as follows from 1970 to 1982:

| Location | | Expansion |
|----------|-----|-----------|
| Ft. Pierce | (a) | 5,000 sq. ft. addition to warehouse |
| | (b) | 5,000 sq. ft. addition to warehouse |
| Ft. Myers | | 7,000 sq. ft. addition to warehouse and paved area |
| Naples | | 5,000 sq. ft. addition to warehouse and paved area |
| Venice | (a) | 7,000 sq. ft. warehouse |
| | (b) | Outside storage |
| | (c) | Paving and fencing |
| St. Petersburg | | 12,000 sq. ft. addition to warehouse |
| Clearwater | (a) | Paved area |
| | (b) | Paved area |
| | (c) | Addition to warehouse |
| Orlando | (a) | Relocation of garage and maintenance facility |
| | (b) | 30,000 sq. ft. addition to warehouse |
| | (c) | Outside storage |
| Winter Haven | (a) | 5,000 sq. ft. warehouse |
| | (b) | Showroom |

When Hughes Supply went public and it was decided that it would acquire its own facilities, petitioner began investing in other activities. In 1974, petitioner acquired a 60-acre citrus grove adjacent to groves already operated by the Russell Hughes family. The grove was operated throughout the years in issue, and was later sold in 1982.

Petitioner also developed property adjacent to the Orlando Executive Airport as hangar facilities. These buildings were under lease during the years in issue to Red Lobster Corp., Florida Gas Co.,[7] Purolator Courier Corp., Sun Bank, and Hughes Supply.

Petitioner acquired an airplane in 1977 for approximately $250,000 which it leased primarily to Hughes Supply, but also chartered to other parties during the years in issue.

In February 1977 for $102,000, petitioner purchased a 60-percent interest in and acted as general manager of a general partnership known as Town & Country Properties. The partnership owned and operated a 96-unit apartment

[7]The successor to Florida Gas Co. is Continental Resources.

complex in Winter Park, Florida. A management firm was employed by petitioner to collect the rents and assist with day-to-day responsibilities. Petitioner remained a partner throughout 1979 and for a portion of 1980, when the apartment complex was sold at a substantial profit.

Petitioner contributed $56,000 in exchange for a 20-percent partnership interest in Virginia Hall, Ltd., in 1977. Virginia Hall, Ltd., was engaged in the business of owning and operating a residential apartment complex in one of the more exclusive neighborhoods of Winter Park. Petitioner remained a partner throughout the years in issue and continued to hold the interest at the time of trial.

In 1979, an 8-percent interest in Nob Hill Properties, Ltd., was purchased by the corporation for $54,000, which interest was held throughout the years in issue. The arrangement was similar to the Town & Country partnership, and the Nob Hill property was in the same general area.

In the latter part of 1981, petitioner's board of directors considered an investment of 5 percent of Highlands Golf Investments, Inc., in Highlands, North Carolina, along with the purchase of four residential lots in the Highlands project. The 5-percent interest was purchased in 1982 for $150,000 and the lots for $225,000. David Hughes had considered the investments personally before recommending them to the board.

In 1982, petitioner also traded in its airplane and purchased a new plane for a total cost of $347,750. In addition, $86,958 was expended for a 24-year old wooden fishing boat to be used as a commercial fishing boat. The boat was chosen after looking at other possible boats over a period of 1 to 1½ years.

### Financial Information

On its Federal income tax returns for the years in issue, petitioner reported the following assets:

| Assets | 1979 | 1980 | 1981 |
|---|---|---|---|
| Cash | $8,133 | $363 | $23,596 |
| Trade notes and accounts receivable | 3,179 | 3,776 | 17,974 |
| Government obligations | | 13,946 | 1,942 |

| Assets | 1979 | 1980 | 1981 |
|---|---|---|---|
| Other current assets | | | |
|   Prepaid insurance — general | $8,857 | | |
|   Prepaid life insurance | 9,560 | $9,560 | $9,560 |
|   Prepaid interest | 29,839 | 20,005 | 14,089 |
| Other investments | | | |
|   Cash surrender value of | | | |
|     life insurance | 72,141 | 91,950 | [1]3,507 |
|   Convest Energy | 476 | | |
|   Town & Country Properties | 38,011 | | |
|   Virginia Hall, Ltd. | (14,717) | (46,880) | (69,385) |
|   Nob Hill Properties | 22,002 | (12,158) | (48,407) |
|   Land held for future | | | |
|     development | 26,922 | 26,922 | 26,922 |
| Hughes Supply, Inc., | | | |
|   common stock (cost)[8] | 911,500 | 1,052,875 | 1,053,216 |
| Buildings and other | | | |
|   depreciable assets (less | | | |
|   accumulated depreciation) | 1,244,520 | 1,155,980 | 1,104,329 |
| Land | 669,690 | 674,062 | 674,062 |
| Intangible assets (less | | | |
|   accumulated amortization) | 10,549 | 10,194 | 9,839 |
| Total assets | 3,040,662 | 3,000,595 | 2,821,244 |

[1]Net of outstanding loans.

The following reflects the liabilities, stockholder equity, and retained earnings of petitioner as of December 31 of the years in issue:

| Liabilities and equity | 1979 | 1980 | 1981 |
|---|---|---|---|
| Current maturity of mortgage note | $15,696 | $17,339 | $19,155 |
| Demand note | 375,000 | 365,000 | 165,000 |
| Dividends and taxes payable, | | | |
|   accrued interest and other | | | |
|   current notes and liabilities | 144,558 | 110,619 | 111,469 |
| Total current liabilities | 535,254 | 492,958 | 295,624 |
| Long-term debt[1] | 901,244 | 764,658 | 666,572 |
| Total liabilities[2] | 1,436,498 | 1,257,616 | 962,196 |

[8]The parties stipulated that because petitioner was an affiliate of Hughes Supply during the years at issue, as that term is defined in subsec. (a)(1) of SEC rule 144, the sale of Hughes Supply stock by petitioner in brokers transactions or by market makers was subject to the requirements contained in that rule. Alternatively, petitioner could have sold its Hughes Supply stock through a private placement or a registered offering. Due to the size of petitioner's Hughes Supply stock holding and the Federal securities law limitations imposed upon the sale of the Hughes Supply stock held by petitioner as an affiliate of Hughes Supply, the net fair market value of all of petitioner's Hughes Supply stock, if sold in a single transaction to an entity or individual not affiliated or associated with it or with Hughes Supply, would have been 90 percent of the over-the-counter value of the stock, or $942,529, $1,125,637, and $1,108,099, as of Dec. 31, 1979, 1980, and 1981, respectively.

| Liabilities and equity | 1979 | 1980 | 1981 |
|---|---|---|---|
| Capital stock | $102,000 | $102,000 | $102,000 |
| Retained earnings | 1,502,164 | 1,640,979 | 1,757,048 |
| Total | 3,040,662 | 3,000,595 | 2,821,244 |

[1] Long-term debt includes the following amounts as the non-current portion of the mortgage note: 1979, $479,410; 1980, $462,071; $1981, $442,916.

[2] Does not include $108,345.90 borrowed against certain life insurance policies owned by petitioner.

The principal payments made by petitioner on its outstanding indebtedness during 1979 through 1982 were:

| Debt | 1979 | 1980 | 1981 | 1982 |
|---|---|---|---|---|
| Mortgage note | $4,894.08 | $15,695.86 | $17,339.42 | $19,155.09 |
| Demand note | 0 | 10,000.00 | 200,000.00 | 10,000.00 |
| Other debt | 160,495.59 | 220,414.25 | 70,719.68 | 291,884.72 |
| Total | 165,389.67 | 246,110.11 | 288,059.10 | 321,039.81 |

The principal balance on petitioner's outstanding debt at the end of years 1979 through 1982 was as follows:

| Debt[1] | 1979 | 1980 | 1981 | 1982 |
|---|---|---|---|---|
| Mortgage note | $495,106 | $479,410 | $462,071 | $442,916 |
| Demand note | 375,000 | 365,000 | 165,000 | 155,000 |
| Other debt | 481,927 | 361,513 | 290,793 | 696,962 |
| Total | 1,352,033 | 1,205,923 | 917,964 | 1,294,878 |

[1] Does not include $108,345.90 borrowed against certain life insurance policies owned by petitioner.

The following were petitioner's working capital needs (operating capital) for one business cycle during the years at issue:

| Year | Working capital needs |
|---|---|
| 1979 | $60,300 |
| 1980 | 38,100 |
| 1981 | 28,800 |

During the years 1979-82, petitioner made the following capital expenditures:

| Year | Amount of expenditure | Description |
|---|---|---|
| 1979 | $41,016 | Purchase of property contiguous to existing Venice, Florida, facility leased to Hughes Supply for additional parking ($30,000 of which represented by note and mortgage) |
| | 1,227 | Legal fees for quiet title action pertaining to Central Ave. property Orlando leased to Hughes Supply |
| | 16,408 | Addition to airplane hangar leased to Sun B |
| | 9,175 | Improvements to airplane hangar leased to Florida Gas Co. |
| | 53,610 | Addition to Winter Haven facility leased to Hughes Supply |
| | 10,295 | Acquisition of additional parcel (Central Avenue, Orlando) for lease to Hughes Supply |
| | 131,731 | Total new capital expenditures |
| 1980 | 35,776 | New engines for 1978 Piper Navajo Chieftan airplane |
| | 4,358 | Purchase of used pickup truck |
| | 1,788 | New citrus trees for citrus grove |
| | 4,372 | Cost of perfecting title to, and clearing, Venice property leased to Hughes Supply |
| | 46,294 | Total new capital expenditures |
| 1981 | 71,600 | Additions to Ft. Pierce facility leased to Hughes Supply |
| | 1,150 | New roof for hangar leased to Sun Bank |
| | 1,250 | New roof for Southern Lighting facility leased to Hughes Supply |
| | 2,630 | New roof for hangar leased to Florida Gas |
| | 76,630 | Total new capital expenditures |
| 1982 | 150,000 | Cost of 5-percent share of Highlands Golf Investments, Inc., Highlands, North Carolina |
| | 225,000 | Cost of four residential lots in Highlands, North Carolina |
| | 86,958 | Commercial fishing boat |
| | 347,750 | Purchase of new airplane for lease to Hughes Supply (price net of trade-in value of old plane but after payoff of $80,000 debt owed on old plane) |
| | 809,708 | Total new capital expenditures |

## Petitioner made the following dividend distributions:

| Years | Amount per year | Years | Amount per year |
|---|---|---|---|
| 1946-73 | none | 1979 | $10,000 |
| 1974 | $10,000 | 1980 | 16,000 |
| 1975 | 10,000 | 1981 | 10,000 |

| Years | Amount per year | Years | Amount per year |
|-------|-----------------|-------|-----------------|
| 1976 ................ | $10,000 | 1982 ................ | $10,000 |
| 1977 ................ | none | 1983 ................ | 30,000 |
| 1978 ................ | 30,000 | 1984 ................ | 90,000˙ |

During the years in issue, petitioner made no loans to its shareholders, to any relatives of any of its shareholders, or to any corporations or other entities owned or controlled by its shareholders or their relatives.

The officer-compensation history of petitioner is as follows:

| Years | Officers | Compensation |
|-------|----------|--------------|
| 1976-79 | Russell V. Hughes, president | $20,000 |
| | Vincent S. Hughes, vice president | 10,000 |
| | David H. Hughes, secretary/treasurer | 10,000 |
| 1980-82 | Russell V. Hughes, president | 30,000 |
| | Vincent S. Hughes, vice president | 20,000 |
| | David H. Hughes, secretary/treasurer | 20,000 |

### Statutory Notice of Deficiency

On September 20, 1983, respondent notified petitioner, pursuant to section 534(b), that the proposed notice of deficiency included an amount with respect to the accumulated earnings tax imposed by section 531. In response, petitioner submitted a statement to respondent, pursuant to section 534(c), setting forth the following grounds on which petitioner relied to establish that the earnings and profits of the corporation were not permitted to accumulate beyond the reasonable needs of the business during the years involved:

1. Need to diversify the Taxpayer's business as a result of being a "one customer" business.

2. Need to purchase stock of the Taxpayer's principal customer to assist in preventing an unfriendly takeover that would jeopardize this source of business.

3. Need to retain earnings to provide for the retirement of long term debt of the Taxpayer.

4. Need to expand and repair existing facilities.

5. Need to provide adequate working capital.

In addition to setting forth the specific grounds, petitioner explained in detail the reasons for the purchases of Hughes Supply stock and the amounts expended for the purchases. In the statement, petitioner also explained the

need to diversify its holdings based on the decision by Hughes Supply to acquire its own new facilities of the type leased from petitioner when needed, to avoid the appearance of impropriety between the related corporations. In this regard, petitioner described the properties purchased in the diversification effort.[9]

Petitioner further set forth its specific capital expenditures for the years 1979-81[10] which were directly related to its trade or business, and described anticipated investments and the amounts thereof, such as the Highlands, North Carolina, properties and the charter fishing boat.

Total indebtedness and current assets were set forth for each year in issue as well; however, no reference was made to amounts required for working capital.

Respondent considered petitioner's statement and determined that it was insufficient to establish that any part of petitioner's earnings and profits for the taxable years 1979, 1980, and 1981 were kept for the reasonable needs of its business. In the statutory notice which was subsequently issued, respondent made the following computations:

COMPUTATION OF ACCUMULATED TAXABLE INCOME

|  | 1979 | 1980 | 1981 |
|---|---|---|---|
| Taxable income | $127,514 | $193,374 | $156,136 |
| Add: | | | |
| (a) Special deductions disallowed | | | |
| 1. Dividends received by corporations | 11,093 | 16,618 | 22,417 |
| | 138,607 | 209,992 | 178,553 |
| Less: | | | |
| (b) Federal income taxes paid or accrued | 39,408 | 51,764 | 52,573 |
| (c) Excess of long-term capital gains over short-term capital losses minus tax on net capital included in income | 0 | 65,685 | 0 |
| Taxable income as adjusted | 99,199 | 92,543 | 125,980 |
| Less: | | | |
| (d) Dividends paid deduction | 10,000 | 16,000 | 10,000 |

[9]With respect to these properties, the only amount referenced was the $102,000 paid in 1977 for a 60-percent interest in a partnership which acquired and operated a residential apartment complex.

[10]See page 12 *supra.*

| | 1979 | 1980 | 1981 |
|---|---|---|---|
| 1. Dividends paid during taxable year current earnings and profits retained | $89,199 | $76,543 | $115,980 |
| Less: Accumulated earnings credit (see below) | 0 | 0 | 0 |
| Accumulated taxable income | 89,199 | 76,543 | 115,980 |

COMPUTATION OF ACCUMULATED EARNINGS CREDIT

| | 1979 | 1980 | 1981 |
|---|---|---|---|
| 1. Minimum accumulated earnings credit | $150,000 | $150,000 | $150,000 |
| 2. Less: Accumulated earnings as of close of prior year | 1,413,716 | 1,502,164 | 1,640,979 |
| 3. Allowable minimum credit under sec. 535(c)(2) | 0 | 0 | 0 |
| 4. Current earnings and profits determined to be retained for reasonable needs of business | 0 | 0 | 0 |
| 5. Less: Deduction for long-term capital gains | 0 | 65,685 | 0 |
| 6. Allowable credit under sec. 535(c)(1) | 0 | 0 | 0 |
| 7. Accumulated earnings credit (greater of line 3 or 6) | 0 | 0 | 0 |

On February 15, 1985, petitioner filed a motion for ruling on burden of proof with respect to accumulation of earnings and profits, which motion was taken curia advisari valt.

OPINION

A corporation formed or availed of for the purpose of avoiding the income tax with respect to its shareholders, by permitting earnings and profits to accumulate instead of being divided or distributed, is subject to the accumulated earnings tax imposed by section 531. Sec. 532(a). The accumulated earnings tax is a means of discouraging the accumulation of corporate earnings not needed in the conduct of a business. See *Ivan Allen Co. v. United States*, 422 U.S. 617, 624 (1975). The tax, considered a penalty, is strictly construed. *Ivan Allen Co. v. United States, supra* at 626.

For the accumulated earnings tax to apply, tax avoidance need not be the sole or even the dominant purpose for the accumulation. Shareholder tax avoidance may be but one of several purposes. *United States v. Donruss Co.,* 393 U.S. 297, 307-309 (1969). The subjective inquiry, that is whether the corporation was formed or availed of for the proscribed purpose, is made with respect to the state of mind of those who control the corporation. *Helvering v. National Grocery Co.,* 304 U.S. 282, 292-294 (1938); *Bahan Textile Machinery Co. v. United States,* 453 F.2d 1100, 1101 (4th Cir. 1972). Section 533(a) establishes the presumption that a corporation with earnings and profits accumulated beyond the reasonable needs of its business was formed or availed of for the proscribed purpose. The presumption is rebuttable, however, if the corporation proves, by the preponderance of the evidence, to the contrary. *Snow Manufacturing Co. v. Commissioner,* 86 T.C. 260, 269 (1986); *Bremerton Sun Publishing Co. v. Commissioner,* 44 T.C. 566, 580-581 (1965).

The accumulated earnings tax is not imposed where a corporation has accumulated its earnings beyond the reasonable needs of its business but lacks the proscribed purpose. *Snow Manufacturing Co. v. Commissioner, supra; Pelton Steel Casting Co. v. Commissioner,* 28 T.C. 153, 173 (1957), affd. 251 F.2d 278 (7th Cir. 1958), cert. denied 356 U.S. 958 (1958). Furthermore, if it is determined that the corporation was formed or availed of for the proscribed purpose, the tax is applied only to that portion of the corporation's earnings and profits which exceeds the corporation's reasonable needs. Sec. 535(a) and (c). See *Bremerton Sun Publishing Co. v. Commissioner, supra; John P. Scripps Newspapers v. Commissioner,* 44 T.C. 453, 465 (1965).

Whether a corporation has permitted its earnings and profits to accumulate beyond its reasonable business needs and whether the corporation was availed of for tax-avoidance purposes are both questions of fact. *Helvering v. National Grocery Co., supra; Bremerton Sun Publishing Co. v. Commissioner, supra* at 582. The reasonable needs of a business are usually determined by the officers and directors of the corporation and we are reluctant to substitute our business judgment for theirs unless the facts and circumstances require us to do so. *Snow Manufacturing Co.*

*v. Commissioner, supra* at 269; *Atlantic Properties, Inc. v. Commissioner,* 62 T.C. 644, 656 (1974), affd. 519 F.2d 1233 (1st Cir. 1975); *Faber Cement Block Co. v. Commissioner,* 50 T.C. 317, 329 (1968).

## Burden of Proof

Initially we will address petitioner's motion regarding the burden of proof. Generally, petitioner bears the burden of proving that it was not formed or availed of for the proscribed purpose. Rule 142(a); *American Metal Products Corp. v. Commissioner,* 34 T.C. 89 (1960), affd. 287 F.2d 860 (8th Cir. 1961); *Pelton Steel Casting Co. v. Commissioner, supra.* However, the burden of proving that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the corporation is on respondent if (1) notification pursuant to section 534(b) has not been sent to the taxpayer prior to issuance of the statutory notice, or (2) in the event proper notification has been sent, if the taxpayer submits a statement, in response to such notice, of the grounds on which the taxpayer relies and sufficient facts to support such grounds, to establish that all or any part of the earnings have not been permitted to accumulate beyond the reasonable needs of the business. Sec. 534(a) - (c).

In order to place the burden of proof on respondent under section 534(c), petitioner's statement:

must constitute more 'than mere notice of an intent to prove the reasonableness of the accumulation. Rather, the taxpayer must show its hand by stating with clarity and specificity the grounds on which it will rely to prove reasonable business needs, and by setting out the facts (not the evidence, but more than conclusions of law) that, if proven, support the alleged business needs for the accumulation. [*Rutter v. Commissioner,* 81 T.C. 937, 939 (1983), quoting B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 8.08, at 8-33 (4th ed. 1979). Fn. ref. omitted.[11]]

The Fifth Circuit[12] has stated the following with respect to section 534(c):

---

[11]*Eden v. Commissioner,* T.C. Memo. 1987-101, 53 T.C.M. 195, at 205, 56 P-H Memo T.C. par. 87,101, at 524.

[12]The 11th Circuit, to which this case is appealable, has not ruled with respect to the sufficiency of the contents of a statement made pursuant to sec. 534(c). However, in *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir. 1981), the 11th Circuit adopted as binding precedent

We think §534's language indicates that the statement simply serves a notice function. Whether the "grounds" divulged in the statement subsequently prove convincing is irrelevant to this function. But just as the statement is not supposed to be legally sufficient on the question of definiteness, neither is it supposed to be a substitute for testimony at trial. Here, MFC sufficiently "showed its hand." We hold that this is all that §534 requires. [*Motor Fuel Carriers, Inc. v. Commissioner*, 559 F.2d 1348, 1352 (5th Cir. 1977), revg. a Memorandum Opinion of this Court. Citations omitted.]

In this case, respondent argues that the statement filed by petitioner alleging justification for its accumulation of earnings and profits is insufficient to place the burden of proof on him because, with the exception of the fourth ground for which expenditures were set out that were subsequently stipulated to by respondent, the assertions set forth in the statement are "vague, indefinite, and incomplete," and thus fail to provide facts sufficient to show the basis of the asserted grounds.

After examining the statement submitted by petitioner and considering respondent's arguments on brief concerning the claimed insufficiency of the statement, we have concluded that petitioner sufficiently set forth specific facts which, if proven, would support the alleged business needs for the accumulation with respect to grounds two, three, and four only. See *Chatham Corp. v. Commissioner*, 48 T.C. 145, 146-147 (1967). With respect to these grounds, we note that petitioner set out the facts which were subsequently presented at trial and argued on brief. Furthermore, petitioner specifically allocated the amount of earnings and profits required to purchase the Hughes Supply stock, to retire long-term debt, and to expand and repair existing facilities.

In contrast, with respect to grounds one and five, petitioner failed to allocate the specific amounts needed to purchase assets to diversify its business and required for operating capital. The only amount provided was the cost of one of the partnership interests.

In order to sufficiently "show its hand" petitioners must, when appropriate, provide details with respect to amounts

---

all of the decisions of the former 5th Circuit rendered prior to the close of business on Sep. 30, 1981.

so that respondent is not required to guess as to what they may be. Without these facts the statement is insufficient to place the burden of proof on respondent. We do not consider this requirement to conflict with the opinion expressed by the Fifth Circuit in *Motor Fuel Carriers, Inc.* In that case, the Fifth Circuit distinguished "between the substantive §533(a) inquiry as to whether the taxpayer's plan is definite and the procedural §534 inquiry as to whether his statement suffices 'to show the basis' of his claim of a need for earnings." 559 F.2d at 1351-1352. We are concerned with whether sufficient facts were provided in petitioner's section 534(c) statement to show the basis of the asserted grounds rather than with whether petitioner's grounds subsequently prove to be convincing.[13] Petitioner has not provided adequate facts unless the amount of working capital required to meet its business needs is set forth in the statement when appropriate. Otherwise respondent has no way of comparing needs with earnings and profits in order to determine whether he will issue a statutory notice.

Based on the foregoing, the burden of proving that petitioner accumulated its earnings and profits beyond the reasonable needs of the business is on respondent with respect to grounds two, three, and four, and is on petitioner with respect to grounds one and five.[14]

*Were earnings and profits permitted to accumulate beyond the reasonable needs of petitioner's business?*

The critical factor in determining whether a corporation has accumulated its earnings and profits beyond the reasonable needs of its business is not the monetary size of the accumulated earnings and profits but the corporation's liquid position and the relation of that position to current

---

[13]See *Michael DiPeppino, Inc. v. Commissioner,* 83 T.C. 979, 982 (1984).

[14]Although petitioner did not set out the amounts required as working capital in the sec. 534(c) statement, the parties have stipulated to the amount of working capital necessary during the years in issue, and both parties included those amounts in their determination of reasonable needs.

Notwithstanding our discussion of the sufficiency of the sec. 534(c) statement, because the facts with respect to the amounts expended and retained are not in dispute and have all sufficiently been made a part of this record, our decision in this case is not based on burden of proof.

and anticipated needs. *Faber Cement Block Co. v. Commissioner,* 50 T.C. 317, 329 (1968).[15]

In this case, the parties both agree that to determine whether petitioner accumulated its earnings and profits beyond the reasonable needs of the business, the net liquid assets of the corporation must be compared to its business needs.[16] However, they disagree with respect to which assets are to be considered liquid assets and with respect to the reasonable needs of the business.

Respondent contends that petitioner's net current assets greatly exceeded the business needs of the corporation in the years in issue and that therefore petitioner had no need to accumulate its current earnings and profits. To demonstrate the unreasonable accumulation respondent relies on the following computations:

| | Year ending Dec. 31— | | |
| --- | --- | --- | --- |
| | 1979 | 1980 | 1981 |
| Net fair market value petitioner's Hughes Supply stock[17] | $942,529 | $1,125,637 | $1,108,099 |
| Other current assets per petitioner's definition | 88,690 | 116,032 | 149,426 |
| Value of orange grove (sales price—1982) | 92,355 | 92,355 | 92,355 |
| Value of partnership interests (cost) | 212,000 | 100,000 | 110,000 |
| Total current assets | 1,355,574 | 1,444,024 | 1,459,880 |
| Less: Current liabilities | (535,254) | (492,958) | (295,624) |

[15]This entails examining the nature and availability of the prior years' accumulated surplus. When a corporation retains its accumulated surplus in the form of liquid assets, such surplus is available to meet business needs. If this surplus meets the current and reasonably anticipated needs of the corporation, there is a strong indication that any accumulation of profits of the current year is beyond the reasonable needs of the business. *Atlantic Properties, Inc. v. Commissioner,* 62 T.C. 644, 656 (1974), affd. 519 F.2d 1233 (1st Cir. 1975); *Edward B. Wolf, Inc. v. Commissioner,* T.C. Memo. 1987-562, 54 T.C.M. 1053, at 1058-1059, 56 P-H Memo T.C. par. 87,562, at 3019.

[16]In *Snow Manufacturing Co. v. Commissioner,* we noted that accumulated earnings and profits and net liquid assets are distinct concepts in tax law. 86 T.C. 260, 278 (1986). Accumulated earnings and profits is the historical net increase in a corporation's assets above stockholders' contributions to capital, while net liquid assets or working capital is the excess of current assets over current liabilities. 86 T.C. at 278. In *Snow Manufacturing Co.* the net liquid assets exceeded accumulated earnings and profits. We held that where net liquid assets exceed accumulated earnings and profits, net liquid assets are reflected in the full amount of accumulated earnings and profits, and that therefore reasonable needs of the business should be compared with accumulated earnings and profits. 86 T.C. at 279. We noted however that, in some cases (such as this case), where accumulated earnings and profits exceed net liquid assets, reasonable business needs have been compared against net liquid assets. 86 T.C. at 279 n. 18., citing for example, *Alma Piston Co. v. Commissioner,* T.C. Memo. 1976-107, affd. 579 F.2d 1000 (6th Cir. 1978); *Bardahl Manufacturing Corp. v. Commissioner,* T.C. Memo. 1965-200.

[17]See note 8 *supra.*

|  | Year ending Dec. 31— | | |
|---|---|---|---|
|  | 1979 | 1980 | 1981 |
| Net current assets | $800,320 | $951,066 | $1,164,256 |
| Less: Business needs (capital expenditures plus operating cycle needs) | (192,031) | (84,394) | (104,738) |
| Excess (unreasonable accumulation) | 608,289 | 866,672 | 1,059,518 |

Because petitioner's accumulation of earnings and profits exceeded petitioner's total reasonable business needs as well as the minimum accumulated earnings credit provided in section 535, respondent maintains that all of petitioner's earnings and profits accumulated for the taxable years 1979, 1980, and 1981 are subject to the accumulated earnings tax.

Petitioner, on the other hand, contends that it had no net current or liquid assets during the years in issue, and thus it had no accumulated surplus from which to satisfy current business needs. Furthermore, since petitioner had no net liquid assets as of the end of each of the years in issue, it was required to retain its current earnings to satisfy the reasonable needs and reasonably anticipated business needs for each of those years. Therefore, petitioner maintains, it is entitled to a credit under section 535(c) equal to its current earnings for each of the years in issue. To demonstrate this position, petitioner relies on the following computations:

| Assets: | 1979 | 1980 | 1981 |
|---|---|---|---|
| Cash | $8,133 | $363 | $23,596 |
| Accounts receivable | 3,179 | 3,776 | 17,974 |
| Government obligations | 0 | 13,946 | 1,942 |
| Other current assets | 48,256 | 29,565 | 23,649 |
| Other liquid investments[18] | 476 | 0 | 0 |
| Total current assets | 60,044 | 47,650 | 67,161 |
| Current liabilities | (535,254) | (492,958) | (295,624) |

---

[18]

|  | 1979 | 1980 | 1981 |
|---|---|---|---|
| Other investments per Schedule L on Form 1120 | $1,056,335 | $1,112,709 | $965,853 |
| Less nonliquid investments: | | | |
| Hughes Supply stock | (911,500) | (1,052,875) | (1,053,216) |
| Partnership interest | (45,296) | 0 | 0 |
| Cash surrender value of life insurance | (72,141) | ( 91,950) | (3,507) |
| Land held for future development | (26,922) | ( 26,922) | (26,922) |
| Total liquid investments | 476 | 0 | 0 |

| Assets: | 1979 | 1980 | 1981 |
|---|---|---|---|
| Net liquid assets (working capital) | ($475,210) | ($445,308) | ($228,463) |
| Reasonable needs: | | | |
| Operating capital for one business cycle | 60,300 | 38,100 | 28,800 |
| Capital expenditures for expansion | 80,000 | 80,000 | 80,000 |
| Airplane engine replacement | 36,000 | 0 | 0 |
| New airplane | 0 | 0 | 348,000 |
| Commercial fishing boat | 0 | 0 | 87,000 |
| Five-percent share of Highlands Golf Investments, Inc. | 0 | 0 | 150,000 |
| Four residential lots at Highlands, N.C. | 0 | 0 | 225,000 |
| Long-term debt repayment | 977,033 | 840,923 | 752,864 |
| Total reasonable needs | 1,153,333 | 959,023 | 1,671,664 |
| Current earnings | 88,448 | 138,815 | 116,069 |

From the positions set forth above, it is apparent that the pivotal issue in this case is whether petitioner's assets are liquid or current assets and thus available to meet petitioner's business needs. Respondent contends that the Hughes Supply stock, the orange grove, and the partnership interests all should be considered liquid assets because they bear no relation to petitioner's business and because they are readily marketable or convertible into cash. Furthermore, respondent argues, the orange grove was treated as a liquid asset when petitioner persuaded the bank that it could repay the demand note, funds from which were used to purchase the Hughes Supply stock.

Petitioner contends that none of these assets were readily marketable and, furthermore, because the assets are business related, they should not be considered current assets which could be disposed of to meet the needs of the business. Petitioner maintains that the Hughes Supply stock was purchased because of the feared takeover and that the other assets were purchased as part of petitioner's plan to diversify its business and holdings. For the reasons below we agree with petitioner.

Generally, a current asset includes items representing the equivalent of cash.[19] However, not all assets readily con-

---

[19]*Suwannee Lumber Manufacturing Co. v. Commissioner,* T.C. Memo 1979-477; *Bardahl Manufacturing Corp. v. Commissioner,* T.C. Memo. 1965-200.

vertible, into cash should be considered current assets.[20] For example, investments in marketable securities which bear some relationship to a corporation's business are considered a proper business application of funds and may be accumulated with impunity. *Cheyenne Newspapers, Inc. v. Commissioner*, 494 F.2d 429, 435 (10th Cir. 1974).[21] In this case, petitioner has amply demonstrated its business purpose for purchasing the Hughes Supply stock, thus we decline to characterize the stock as a current asset. We are convinced that members of the Hughes family feared that the stock acquisitions by CED and its affiliates presented a realistic threat to the control of Hughes Supply and that if CED and its affiliates were to control a larger block of stock than the Hughes family and other parties "friendly" to them, that both Hughes Supply and petitioner would be impacted negatively.[22] See *Bremerton Sun Publishing Co. v. Commissioner*, 44 T.C. 566, 587 (1965); but cf. *Crow v. Commissioner*, 79 T.C. 541, 561 (1982).

We recognize that petitioner's purchase of stock benefited the Hughes family members who were shareholders of both corporations. However, if the stock was not purchased by petitioner, it is very likely that CED would have purchased it as it became available. As we have already indicated, if CED controlled the largest block of Hughes Supply stock, the impact on Hughes Supply and petitioner would very likely have been negative. We are convinced that this is not a situation where the funds which were used to purchase the stock could have been distributed to the family members who in turn could have bought the Hughes Supply stock as it became available. Rather, we are persuaded that the family members were not in a position to purchase the stock, and instead caused petitioner, which had sufficient assets available to secure financing, to borrow the funds

---

[20]See *Bremerton Sun Publishing Co. v. Commissioner*, 44 T.C. 566, 587 (1965); *John P. Scripps Newspapers v. Commissioner*, 44 T.C. 453, 467 (1965); *Suwannee Lumber Manufacturing Co. v. Commissioner*, *supra;* and compare *Faber Cement Block Co. v. Commissioner*, 50 T.C. 317, 328 (1968), and *Bardahl Manufacturing Corp. v. Commissioner*, *supra.*

[21]Because we find that the stock was purchased for a business purpose, we will not address petitioner's arguments with respect to the restrictions on the marketability of the stock.

[22]Even though most of the Hughes Supply leases were renewed for 10-year periods during the years in issue, there is no guarantee that CED would have continued to renew them. Given the fact that petitioner was essentially a "one customer" business, we are convinced that steps taken to sustain the business relationship were warranted.

with which to purchase the stock in order to maintain a sufficient margin of controlling shares.[23]

We are also persuaded that the orange grove and partnership interests purchased in 1977 and 1979[24] were purchased as part of petitioner's efforts to diversify its business. When Hughes Supply ceased to lease new properties from petitioner, the officers and directors of the corporation identified the need to diversify and chose to invest in projects which appeared to be sound business investments. There is no indication that these investments were made to benefit petitioner's shareholders personally.[25] Rather it appears, from the evidence presented, that petitioner had a need to diversify and chose to do so by purchasing interests in residential real estate and by purchasing the orange grove.[26] Furthermore, we do not consider these assets "liquid," or readily convertible into cash, as respondent suggests. Based on the foregoing, we find that the orange grove and partnership interests are not current assets.

Having determined that the Hughes Supply stock, the orange grove, and the partnership interests purchased in 1977 and 1979 are not current assets, petitioner was, as claimed, in a net nonliquid position during the years in issue. None of those assets were available from which to fund the reasonable needs of the business.[27] Moreover, upon comparing petitioner's current earnings and profits for each year, taking into account, successively, accumulations in

---

[23]In this respect, we note that it appears that respondent is essentially trying to argue that petitioner borrowed itself into a situation where it became subject to the accumulated earnings tax. We do not see how this would be consistent with a purpose of accumulating earnings to avoid tax to shareholders.

[24]In determining the liquidity of the corporation during the years in issue, we have not considered the assets acquired in 1982, the acquisition of which petitioner claims was reasonably anticipated in 1981.

[25]Compare *Bardahl Manufacturing Corp. v. Commissioner, supra.*

[26]We note in this regard that petitioner admittedly did not regularly reflect in the records of the corporation, such as minutes from the board of directors meetings, evidence of the plan to diversify. However, it is clear from the fact that the investments were made and were retained that the plan to diversify was contemplated and implemented. Under these circumstances the plan to diversify holdings has been demonstrated. Compare *Guarantee Abstract & Title Co. v. United States,* 696 F.2d 793 (10th Cir. 1983) (involving less stringent requirements for closely held corporations for purposes of determining whether a plan to use accumulated earnings to diversify is sufficiently specific and definite). See also *John P. Scripps Newspapers v. Commissioner, supra* at 469.

[27]The utilization of working capital by a business for the purpose of purchasing fixed assets decreases the amount of funds otherwise available for operating purposes. *Bremerton Sun Publishing Co. v. Commissioner,* 44 T.C. 566, 583 (1965).

each of the years before the Court, with the undisputed portion of petitioner's reasonable needs for those years, it is apparent that the current earnings were insufficient to meet those needs.[28] We therefore hold that petitioner accumulated its earnings and profits during the years in issue to meet the reasonable needs of its business. Where a taxpayer can show that all of its current earnings were accumulated for the reasonable needs of the business, there is no accumulated earnings tax since the accumulated earnings credit eliminates the amount against which the tax is imposed. See, e.g., *Magic Mart, Inc. v. Commissioner,* 51 T.C. 775, 798-799(1969); *Faber Cement Block Co. v. Commissioner.* 50 T.C. 317, 336 (1968).[29]

To reflect the foregoing,

*Decision will be entered for the petitioner.*

---

[28]Sec. 537 defines reasonable needs of the business. Sec. 1.537-1(a), Income Tax Regs., provides that an accumulation of earnings and profits (including the undistributed earnings and profits of prior years) is in excess of the reasonable needs of the business if it exceeds the amount that a prudent businessman would consider appropriate for the present business purpose and the reasonably anticipated future needs of the business. The need to retain earnings must be directly connected with the needs of the corporation itself and must be for bona fide business purposes. Sec. 1.537-2(a), Income Tax Regs., provides that whether a particular ground or grounds for the accumulation of earnings and profits indicate that the earnings and profits have been accumulated for the reasonable needs of the business is dependent upon the particular circumstances of the case.

Here the parties both included in petitioner's reasonable needs amounts for working capital, and the capital expenditures related to the business in each year. In addition, the parties stipulated to the amount of debt that was paid during the years in issue. See sec. 1.537-2(b)(3) and (4), Income Tax Regs. Comparing these needs to current earnings, without even considering the needs contested by the parties, such as anticipated expenditures and amounts to satisfy debt, it is obvious that the earnings were not accumulated beyond the needs of petitioner's business.

| | 1979 | 1980 | 1981 |
|---|---|---|---|
| Current earnings and profits retained (per statutory notice) | $89,199 | $76,543 | $115,980 |
| Needs of business: | | | |
| Operating capital | 60,300 | 38,100 | 28,800 |
| Capital expenditures | 131,731 | 46,294 | 76,630 |
| Principal payments (actually made on indebtedness) | 165,389 | 246,110 | 288,059 |
| Total | 357,420 | 330,504 | 393,489 |

We do not, by this comparison, mean to imply that other amounts would not be considered reasonable needs, such as the entire amount of the demand note (see, e.g., *Motel Associates v. Commissioner,* T.C. Memo. 1986-426), but, instead, we see no need to further address these issues since the resolution of this case would not differ.

[29]Having reached this conclusion, there is no need to address respondent's additional arguments with respect to whether petitioner was formed or availed of for the proscribed purpose. *Magic Mart, Inc. v. Commissioner,* 51 T.C. 775, 799 (1969).