PETERSON BROTHERS STEEL ERECTION COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Peterson Bros. Steel Erection Co. v. Commissioner
Docket No. 37768-84
United States Tax Court
T.C. Memo 1988-381; 1988 Tax Ct. Memo LEXIS 412; 55 T.C.M. (CCH) 1605; T.C.M. (RIA) 88381; August 16, 1988
Edward D. Urquhart and Charles J. Escher, for the petitioner. Melanie R. Urban and Kermit O. Keeling, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined a deficiency in Federal income tax for petitioner's taxable year ending June 30, 1981, in the amount of $ 235,190.91. After concessions by the parties, the sole issue for decision is whether petitioner is liable for the accumulated earnings tax imposed by section 531[1] for its fiscal year ending June 30, 1981. FINDINGS OF FACT Some of the facts were stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. At the time the petition in this case was filed, petitioner's principal place of business was Houston, Texas. Petitioner is a Texas corporation which erected the steel framework and supports for large building construction *415 projects. It provided the expertise, equipment and labor to erect the structural steel and steel floor decking for commercial and industrial buildings. Since the late 1970's, petitioner has been particularly successful contracting jobs for high rise commercial buildings. Petitioner does not keep an inventory of or supply the steel to be erected. Petitioner started as a partnership in 1936 operated by three brothers, Homer R. Peterson I, Antone L. Peterson, Sr., and Ralph Peterson. Ralph Peterson left the business in the late 1930's. In 1952, petitioner added two partners, George A. Peterson and Antone L. Peterson, Jr., both sons of Antone L. Peterson. George had begun working part time with petitioner in 1940 and began full time in 1950 after graduating from Rice Institute with a degree in civil engineering. Antone, Jr., had also worked part time with the partnership since before he was 16 and began full time in 1949, also after having obtained a degree in civil engineering from Rice Institute. In 1971, George and Antone, Jr., incorporated the business and became its only two shareholders. Around the time of the incorporation, a third generation of Petersons began working *416 with the business. Homer R. Peterson II, son of Antone L. Peterson, Jr., began working part time with the company in 1968 and full time in 1973, after studying civil engineering at both Rice Institute and Southern Methodist University and graduating from Southern Methodist University in 1973. Lawrence A. Peterson, son of George A. Peterson Methodist University with a degree in civil engineering. For the year in issue, petitioner's stockholders and officers were as follows: Antone L. Peterson, Jr.
12,500 shares
President
George A. Peterson
12,500 shares
Secretary/Treasurer
Homer R. Peterson II
12,500 shares
Vice President
Lawrence A. Peterson
12,500 shares
Vice President
Petitioner's reputation in the construction industry in the Houston area was excellent throughout the year in question and in prior years as well. During the year in issue, petitioner's contracts varied in amount from $ 30,000 to over $ 4,000,000. Once petitioner bid on a job, the bid could remain outstanding for varying periods of time from a day to a year and a half. Even after a bid was accepted, the job could be delayed or cancelled. Despite petitioner's success in its business *417 for 50 years, it is unable to predict with any certainty which of its bids would be accepted at any given time. The construction environment in the Houston area during the year in issue is best described as a boom time. There were 105 commercial buildings starts in the area in 1980 and 170 starts in 1981. In the 5-year period ending with the fiscal year 1981, petitioner's gross receipts increased from approximately $ 2,000,000 to well over $ 5,000,000. In the same 5-year period, petitioner's taxable income increased from approximately $ 57,000 to over $ 900,000. Once petitioner has started a job, it bills the contractor periodically, generally monthly, and is paid the following month. Thus, petitioner may carry parts of a project for up to 8 weeks before receiving payment for its work which requires substantial cash resources. Petitioner borrowed $ 250,000 at the prime rate of interest in June 1981 because it was short of cash. In the construction industry general contractors commonly withhold $ 10 percent of the subcontract price from their subcontractors until the subcontractor has completed its part of the job. Occasionally, this "retainer" is kept until the end of *418 the entire job. The largest expense in the operation of petitioner's business is labor costs. Petitioner's total labor and labor-related costs were $ 2,837,727 in fiscal year 1981. The following year, petitioner's labor costs nearly doubled due to the increased work load. Petitioner's average monthly balance in its general operating account was approximately $ 118,000 for fiscal year 1981 and approximately $ 174,000 for fiscal year 1982. Petitioner is sometimes required to provide a performance bond on a job. Trinity Companies has been petitioner's sole bonding company since 1963. In computing whether it will issue a bond, Trinity takes into consideration petitioner's work program on hand, which is measured by the total outstanding contract prices under all of its ongoing bonded and unbonded jobs less the amounts petitioner has billed pursuant to such contracts. Trinity establishes for its clients a working line of credit or work program limit over which it will not normally issue a bond. The working line of credit is an amount the surety company determines to be the work in progress capacity (for all jobs whether bonded or unbonded) of the contractor. This is commonly *419 termed the contractor's bonding capacity. On February 27, 1981, Trinity established a working line of credit for petitioner of $ 6,000,000 overall, $ 1,000,000 per job. On October 1, 1981, in response to petitioner's increased program, Trinity extended petitioner's working line of credit to $ 10,000,000 overall, $ 5,000,000 per job. In increasing the working line of credit, Trinity examined petitioner's audited financial statements for fiscal year 1981 and noted that the company had increased its working capital position and net worth in 1981. Petitioner was aware of upcoming projects well in advance of the dates it actually submitted bids and considered the likelihood of winning contracts in determining its working capital needs. Accordingly, we have evaluated petitioner's work program within an extended time frame rather than as of the end of the fiscal year in issue. During the fiscal year in issue and within 6 months of its close, petitioner's work program consisted of the following projects: Project
Date
Contract Price
Transco Tower
Bid Accepted 3/26/81
$  4,605,000
American General
Bid Accepted 7/30/81
$  3,200,000
Tower
Three Houston Center
Started 5/18/81
$  3,900,000
1600 Smith Bldg./
Bid Outstanding
Cullen Center
11/81
$  6,150,000
Louisiana Project
(Joint Venture:
Petitioner's share
25 percent)
Bid Accepted 10/81
$    837,500
Campeau Bldg.
Bid Outstanding 11/81
$  6,487,500
Four Houston Center
Bid Outstanding 11/10/81
$  4,075,000
Total
$ 29,255,000
*420 This table is incomplete since it lists only petitioner's larger projects during the relevant time period. In order to reflect the fact that 82.5 percent of the contract price for Three Houston Center had been billed as of December 31, 1981, we will subtract $ 3,217,000 from the total above, resulting in an approximate work program of $ 26,038,000. In determining whether to issue a bond, the surety industry's rule of thumb is that a contractor's net quick assets ("net quick") should equal 10 percent of its work in progress. Net quick is comprised of cash and readily collectable accounts receivable less current notes and accounts payable. Trinity calculated petitioner's net quick from its June 30, 1981, financial statements to be $ 721,126, calculated as follows: Total Current Assets
$ 1,588,336
Less:  Prepaid insurance
$ 60,800
Prepaid Federal Taxes
76,093
136,893
$ 1,451,443
Less:   Total Current Liabilities
730,317
$   721,126
Trinity recognizes that petitioner's area of expertise in the construction industry has a much higher cash requirement because it is a labor intensive operation. Since petitioner *421 has very little subcontractor work, it is unable to pass along its cash requirements to others. Trinity requires stronger working capital and net worth positions for a labor intensive contractor such as petitioner. Trinity has encouraged petitioner to maintain its financial strength for bonding purposes. In addition to examining the work program and the net quick assets of a contractor, the bonding company also looks to intangible factors such as the contractor's character, experience and reputation. Petitioner rated very highly in all categories. Petitioner is not able to predict when or if a bond may be required on any particular job on which it has bid. It attempts to avoid providing a bond whenever possible, since the cost of a bond is added to the bid. The ability to avoid the cost of a bond in its bid gives petitioner a competitive edge. Petitioner generally avoids the requirement of a bond by providing a letter from its bank that it is financially strong. Petitioner's officers also wanted to avoid the requirement of a bond because of the possibility that personal indemnities might be required as a condition for issuing the bond. In an earlier year on a job which *422 required a bond, the bond was issued only after the bonding company obtained personal indemnities from George A. Peterson and Antone L. Peterson, Jr., and their wives. Personal indemnities have not been required since that time. Additionally, the bonding company does not like to be in the position of relying on the indemnity of the shareholder. It prefers that the contractor be able to "stand on its own feet" with the financial ability to perform its obligations rather than having to pay for a loss and then seek reimbursement from the indemnitor. Petitioner owns and uses a variety of complicated machinery for steel erection. This machinery includes crawler cranes, truck cranes, guyed derricks, hoisting engines, compressors, welding machines, stud welding machines, communication equipment, stiff legs and poles. During the fiscal year 1981, petitioner had a larger work load and was operating more if its equipment than in past years. In April 1981, petitioner purchased a 100-ton truck crane at a cost of $ 440,000, including tax and freight. In August 1981, petitioner's board of directors authorized an investigation into the acquisition of a 50-ton guy derrick. In September 1981, *423 petitioner purchased the guy derrick and revamped it at a total cost of $ 95,000. Additionally, the corporation purchased a multiple operator welding system and 2 new electric Ingersoll-Rand 100 cfm compressors. Petitioner prefers to purchase its equipment rather than rent it. Petitioner did not know what equipment it would need until it learned what jobs it had won and the structural steel of the project had been totally designed. Accordingly, petitioner was unable to precisely predict its future equipment needs at any given time. However, petitioner was aware that its manpower and equipment were almost fully utilized by its work load and backlog as of the end of fiscal year 1981 and could reasonable anticipate that additional jobs would require additional equipment. The construction industry is subject to a number of risks and contingencies. Petitioner's labor force consists almost entirely of union members. Consequently, petitioner is subject to strikes, not only at job sites from its own workers but also factory strikes, railroad strikes and truck strikes. However, there is no evidence that any strikes occurred during the year in issue. Petitioner may realize losses *424 by mistakenly estimating quantity and price of materials and labor. Any delay in a project costs petitioner money and can be caused by a delayed start, days lost to bad weather, material shortages and other factors beyond petitioner's control. Escalation of material and labor costs during the life of a job can also cut into a contractor's profits. During 1981, building costs escalated at a rate of 12 percent per year. Finally, since petitioner is involved in the steel erection of high-rise buildings, it is uniquely vulnerable to the exposure of liability law suits resulting from personal injury. During fiscal year 1981, a worker on one of petitioner's projects fell and sustained an injury that left him a paraplegic. Petitioner has since been sued as a fourth party defendant with respect to that accident. In November 1980, petitioner's Board of Directors recommended that some of petitioner's funds be placed in banks with whom petitioner might expect to do business in the near future. Accordingly, during the 1981 fiscal year, petitioner maintained three $ 100,000 certificates of deposit at three different banks. One certificate was placed with First City National Bank for *425 whom the company just completed a 50-story building and which was planning to erect a 12-story building. Another certificate was placed with Bank of the Southwest, which petitioner considered to be a potential builder in the near future. The third certificate was placed with Cullen Bank & Trust Company, a part of Cullen Center, which was planning twin 40-story buildings. Since placing the certificates with the bank, petitioner has been awarded the contract to construct the structural steel for a 56-story Cullen Center project. At the beginning of its 1981 fiscal year, petitioner held $ 900,000 as an investment in Eurodollars. Over $ 400,000 of that amount was used to purchase the 100-ton crane. By the end of fiscal year 1981, petitioner had no remaining Eurodollar investment. In November 1980, petitioner established a $ 250,000 line of credit with Texas Commerce Bank. Petitioner's agreement with the bank required that petitioner maintain a tangible net worth at least equal to total liabilities, but no less than $ 1,000,000. Additionally, the agreement mandated that full ownership of petitioner would remain in the Peterson family. Petitioner borrowed the full amount of *426 its line of credit in June 1981 at the prime rate of interest, then around 20 percent. The loan was repaid in July 1981. In October 1981, petitioner successfully negotiated an increase in its line of credit to $ 500,000. Petitioner had requested the increase because of the significant increase in its business which required that petitioner carry additional receivables and meet payrolls which were larger than in the past. Under the increased line of credit, petitioner was required to maintain a minimum tangible net worth of $ 1,500,000. In 1973, petitioner acquired 1,750 acres of land in Zavala County for entertainment and investment purposes. Zavala County is located approximately 300 miles from the Houston area. In 1974, petitioner acquired an additional 400-acre tract. In 1976, petitioner disposed of the 1,750-acre tract to Star Investment Group for a small profit. Star Investment Group consists of George and Antone, Jr.'s children. Petitioner thereafter leased the tract from Star Investment and has since used it as an entertainment facility for company employees, customers and business associates. On two occasions, petitioner has made interest-free loans to shareholders. *427 In November 1975, petitioner loaned to Homer Peterson II and Lawrence Peterson $ 26,836 and $ 32,883, respectively. These loans were made to fund the premiums on split dollar lie insurance on the lives of their fathers, Antone Jr. and George, so that the sons would be able to purchase their fathers' stock upon their deaths. Additionally, in June 1980, petitioner loaned to Homer Peterson II and Lawrence Peterson $ 196,875 each. These loans were made to enable the sons to each purchase up to a 25 percent share of petitioner's equity to begin transferring ownership to the next generation of Petersons. These loans were each secured by a pledge of the stock and security agreements in favor of petitioner. The outstanding balance of these loans at the end of petitioner's fiscal year 1981 was $ 331,875. Both loans had been repaid in full by June 10, 1983. The following table summarizes the salaries paid to the four shareholder/officers for the 5-year period ending with June 30, 1981: Antone, Jr.
George
Homer II
Lawrence
June 30, 1977
Salary
$  63,300.00
$  63,300.00
$  24,000.00
$  25,000.00
Bonus
35,000.00
35,000.00
12,500.00
12,500.00
Total
$  98,300.00
$  98,300.00
$  36,500.00
$  36,500.00
June 30, 1978
Salary
$  63,300.00
$  63,300.00
$ 24,000.00
$  24,000.00
Bonus
30,000.00
30,000.00
15,000.00
15,000.00
Total
$  93,300.00
$  93,300.00
$ 39,000.00
$  39,000.00
June 30, 1979
Salary
$  63,300.00
$  63,300.00
$  30,000.00
$ 30,000.00
Bonus
35,000.00
35,000.00
25,000.00
25,000.00
Total
$  98,300.00
$ 98,300.00
$  55,000.00
$  55,000.00
June 30, 1980
Salary
$  63,300.00
$  63,300.00
$  36,000.00
$  36,000.00
Bonus
50,000.00
50,000.00
50,000.00
50,000.00
Total
$ 113,300.00
$ 113,300.00
$  86,000.00
$  86,000.00
June 30, 1981
Salary
$  63,000.00
$  63,300.00
$  42,000.00
$  42,000.00
Bonus
60,000.00
60,000.00
60,000.00
60,000.00
Total
$ 123,300.00
$ 123,300.00
$ 102,000.00
$ 102,000.00
Total
*428 June 30, 1977
Salary
Bonus
Total
$   269,600.00
June 30, 1978
Salary
Bonus
Total
$   264,600.00
June 30, 1979
Salary
Bonus
Total
$   306,600.00
June 30, 1980
Salary
Bonus
Total
$   398,600.00
June 30, 1981
Salary
Bonus
Total
$   450,600.00
Total
$ 1,690,000.00
The following table summarizes petitioner's cash dividend history from 1975 through the year following the year at issue: Date
Received
Date
Amount
Amount
Declared
Date
Paid
Paid
Distributed
05/29/75
06/02/75
06/27/75
$ 0.50
$ 12,500.00
05/29/80
06/02/80
06/27/80
1.00
25,000.00
06/25/81
06/25/81
06/29/81
1.00
50,000.00
12/30/81
12/31/81
01/12/82
0.75
37,500.00
05/27/82
06/01/82
06/28/82
0.75
37,500.00
The following table summarizes petitioner's stock dividend history from 1972 through the year in issue: Amount
Date
Amt. of Dividend
Capitalized
Jan. 3, 1972
Original Issue
5,000 shares
$  50,000
Jan. 12, 1973
Two For One Split
10,000 shares
100,000
June 29, 1974
Two For Three Split
10,000 shares
100,000
Oct. 8, 1980
Two For One Split
25,000 shares
250,000
*429 Date
Recipients
Jan. 3, 1972
Antone L. Peterson, Jr.
George A. Peterson
Jan. 12, 1973
Antone L. Peterson, Jr.
George A. Peterson
June 29, 1974
Antone L. Peterson, Jr.
George A. Peterson
Oct. 8, 1980
Antone L. Peterson, Jr.
George A. Peterson
Homer R. Peterson II
Lawrence A. Peterson
The following is petitioner's balance sheet at the end of the fiscal year ended June 30, 1981, the year in issue: CURRENT ASSETS
Cash
$    43,269
Certificates of deposit
300,000
Accounts receivable:
Trade
1,100,400
Employees
776
Other
6,998
Prepaid insurance
60,800
Prepaid Federal income taxes
76,093
Total current assets
$ 1,588,336
PROPERTY, PLANT AND EQUIPMENT - at cost
1,493,683
Less accumulated depreciation
498,506
Net property, plant and equipment
995,177
OTHER ASSETS
Cash value of officers' life insurance -
Net of loans
59,320
Club memberships
15,543
Notes receivable - Stockholders
331,875
Total other assets
406,738
Total assets
$ 2,990,251
CURRENT LIABILITIES
Accounts payable:
$    51,228
Union plans
31,915
Employees
7,116
Other
198
Payroll and sales taxes payable
1,840
Note payable - Bank
250,000
Accrued expenses
Wages
38,784
Interest
1,946
Deferred Federal income tax
347,290
Total current liabilities
$    730,317
*430 STOCKHOLDERS' EQUITY
COMMON STOCK - $ 10 par value, 200,000
shares authorized, 25,000 shares outstanding
at 6-30-80 and 50,000 shares outstanding
at 6-30-81
500,000
RETAINED EARNINGS
1,759,934
Total stockholders' equity
2,259,934
Total liabilities and stockholders'
equity
$ 2,990,251
On August 27, 1984, respondent notified petitioner, pursuant to section 534(b), that the proposed notice of deficiency included an amount with respect to the accumulated earnings tax imposed by section 531. In response, petitioner submitted a timely statement to respondent pursuant to section 534(c) setting forth the grounds on which petitioner relied to establish that the earnings and profits of the corporation were not permitted to accumulate beyond the reasonable needs of the business during the year involved. Those grounds were as follows: 1. Need for adequate working capital to maintain bonding capacity to undertake jobs of the size which petitioner was pursuing. 2. Need to be able to self insure, if necessary. 3. Equipment needs which were dictated by the fluctuating circumstances of large construction jobs *431 involving high rise office buildings where the need for a particular piece of equipment can arise suddenly on the basis of one or two jobs. 4. Petitioner's history of payment of dividends and substantial salaries to shareholders and officers undermines respondent's claim that petitioner had a tax avoidance motive. 5. Need for sufficient capital to see petitioner through a delay caused by a strike. Petitioner must renegotiate its contract with the International Association of Bridge, Structure and Ornamental Ironworkers' Union on an annual basis. Therefore, it is subject to strike every year. 6. Need for adequate capital to fund continuing natural growth. Respondent determined that petitioner was formed or availed of for the purpose of avoiding income tax by permitting earnings and profits to accumulate rather than being divided or distributed. Accordingly, respondent made the following computation in the statutory notice which was subsequently issued: Computation of Accumulated Earnings Tax
Year Ended
June 30, 1981
Accumulated Taxable Income:
Taxable Income
$    972,029.55 Less: Federal Income Tax
(341,020.85)
Accumulated Earnings Credit
-0-     [see below]
Net Capital Gains
-0-     Dividends Paid
(50,000.00)
Accumulated Taxable Income
$    581,008.70 Accumulated Earnings Tax:
27.5% x $ 100,000.00
$     27,500.00 38.5% x Accumulated taxable
Income in excess of $ 100,000.00
185,188.35 Accumulated Earnings Tax
$    212,688.35 *432 Computation of Accumulated Earnings Credit
Minimum credit
$    150,000.00 Less: Accumulated earnings as
of close of prior year
(1,762,864.00)
Allowable credit
(IRC Section 535(c)(2))
-0-     Current earnings determined to be
retained for reasonable needs of
business
-0-     Allowable credit
(IRC Section 535(c)(1))
$      -0-     On February 10, 1986, respondent filed a Motion to Determine Sufficiency of Petitioner's Section 534(c) Response, which motion was taken curia advisari vult. ULTIMATE FINDING OF FACT In the year in issue, petitioner did not permit its earnings and profits to accumulate beyond the reasonable needs of its business, and was not availed of for the purpose of avoiding income tax with respect to its shareholders by permitting earnings and profits to accumulate rather than being divided or distributed. OPINION Section 531 imposes a tax upon the accumulated taxable *433 income of a corporation formed or availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed. Section 532(a). This tax is considered to serve as a penalty and is to be strictly construed. Ivan Allen Co. v. United States,422 U.S. 617, 626 (1975). Section 533 provides a presumption that the prohibited purpose is established if the earnings and profits are accumulated beyond the reasonable needs of the business, unless the corporation proves otherwise by a preponderance of the evidence. Snow Manufacturing Co. v. Commissioner86 T.C. 260, 269 (1986); Bremerton Sun Publishing Co. v. Commissioner,44 T.C. 566, 580-581 (1965). The determination of whether an accumulation exceeds the reasonable needs of a business is a question of fact. Helvering v. National Grocery Co.,304 U.S. 282 (1938). The reasonable business needs of a corporation include reasonable anticipated needs. Section 537(a)(1). We are reluctant to substitute or business judgment for that of the corporate officers and directors *434 who usually determine the reasonable needs of a business. Snow Manufacturing Co. v. Commissioner, supra at 269; Faber Cement Block Co. v. Commissioner,50 T.C. 317, 329 (1968). A preliminary matter to be addressed is respondent's Motion to Determine the Sufficiency of Petitioner's Section 534(c) Response. Section 534 provides a method whereby the corporation may place on respondent the burden of proof as to whether earnings were accumulated beyond the reasonable needs of the business. If after notification of respondent's intention to impose the accumulated earnings tax, the corporation submits a statement of grounds on which it relies to establish that its earnings and profits were not accumulated beyond its reasonable needs, together with facts sufficient to show the basis thereof, the burden of proof as to these grounds is on respondent. Section 534(a)-(c). Our ultimate findings of fact herein, in favor of petitioner, have been made on the assumption that the burden remained with petitioner. Therefore, there is not need for us to further consider respondent's motion in this regard.
*435 In determining whether earnings and profits have accumulated beyond the reasonable needs of a business, the crucial factor to be examined is the corporation's liquid position and the relation of that position to current and anticipated needs. Hughes Inc. v. Commissioner,90 T.C. 1 (1988); Faber Cement Block Co. v. Commissioner, supra at 329; see also Snow Manufacturing Co. v. Commissioner, supra.
On brief, respondent urged us to compare petitioner's reasonable needs to its net assets which respondent calculated to be $ 2,259,934. We have declined to do so. This approach would not allow petitioner any credit for assets which are clearly and unquestionable devoted to petitioner's business such as plant and equipment, and prepaid taxes and insurance. We note that even this unrealistic and unsound approach of respondent would not change the result herein. The parties are in disagreement as to what constitutes petitioner's liquid assets. Respondent argues that petitioner's liquid assets include the outstanding balance of loans made to shareholders as well as the value of the Zavala property. We conclude that the outstanding balance of *436 the loans to shareholders should be included as a liquid asset because we believe petitioner could swiftly convert those notes to cash if the need arose. In fact the notes were paid off within 2 years after the end of the fiscal year at issue. However, we conclude that the Zavala property was held for business purposes, i.e., entertainment of customers and employees, and was not sufficiently liquid to be included as a liquid asset. Accordingly, we calculate petitioner's net liquid assets as follows: Current assets as shown on
$ 1,588,336
petitioner's balance sheet
Add: outstanding balance of
shareholder loans
331,875
$ 1,920,211
Less: prepaid insurance and
Federal income taxes
136,893
$ 1,783,318
Less: current liabilities as shown
on petitioner's balance sheet
730,317
Net liquid assets
$ 1,053,001
Accordingly, in determining whether petitioner accumulated its earnings and profits beyond the reasonable needs of the business, we will compare those needs against petitioner's net liquid assets which we determined above to be $ 1,053,001. We now must determine what constitutes petitioner's reasonable business needs, *437 including its reasonably anticipated needs. Section 1.537-1(a), Income Tax Regs., provides that an accumulation of earnings and profits (including the undistributed earnings and profits of prior years) is in excess of the reasonable needs of the business if it exceeds the amount that a prudent businessman would consider appropriate for the present business purpose and the reasonable anticipated future needs of the business. The need to retain earnings must be directly connected with the needs of the corporation itself and must be for bona fide business purposes. Section 1.537-2(a), Income Tax Regs., provides that whether a particular ground or grounds for the accumulation of earnings and profits have been accumulated for the reasonable needs of the business is dependent on the particular circumstances of the case. The primary area of dispute between the parties centers on the amount of working capital petitioner needed to maintain its bonding capacity. To a lesser extent, the parties have also focused on the reasonableness of petitioner's *438 needs for equipment and other contingencies as well as what assets were available to meet those needs. Petitioner's ability to obtain a bond on a job when required is of primary importance and is clearly a reasonable need of the business. Bonding capacity is determined based upon a comparison of the contractor's uncompleted work program with its net quick assets. The general rule is that net quick assets should approximate 10 percent of the uncompleted work program. We recognize that this is merely a rule of thumb; nevertheless, we consider it a reasonable rule to use in resolving this issue with one modification. We will compare petitioner's work program to its net liquid assets. As detailed above, we concluded that during the fiscal year in issue and within 6 months of its close, petitioner's work program amounted to $ 26,038,000. This represented a substantial increase in its work program over previous years. Ten percent of the total work program would be over $ 2,600,000. Accordingly, petitioner's net liquid assets of $ 1,053,001 on June 30, 1981, were substantially less than the amount which would have been required if petitioner had needed to obtain a bond. Therefore, *439 we conclude that petitioner's net liquid assets were not in excess of the amount it needed or reasonably anticipated would be needed in the following year to meet the requirements for performance bonds. The fact that petitioner was rarely required to provide a performance bond on its jobs is immaterial since it had to be prepared to provide a bond if required. It was able to avoid providing bonds largely because of its financial strength, including its net liquid assets and credit reputation. The financial strength that permitted petitioner to obtain performance bonds was the same strength that made the bonds unnecessary. Respondent has argued that petitioner could have distributed its earnings and still be able to provide a bond if required simply by having its shareholders give personal indemnities for the bond. However, this ignores the fact that $ 1,100,400 of petitioner's assets consisted of accounts receivable which were not readily distributable. Additionally, petitioner points out, and we agree, that such an approach would essentially undermine one of petitioner's reasons for incorporating which was to provide its shareholders with limited liability. Furthermore, the *440 evidence is contrary to respondent's assertion that indemnity from the shareholders is the equivalent of adequate working capital from the surety's point of view. Any good lawyer will always advise a client to avoid giving personal indemnities and guarantees if at all possible. Respondent's suggested solution runs contrary to sound business and legal practice and we dismiss it accordingly. Our conclusion that petitioner had a reasonable need to maintain substantial working capital to preserve its bonding capacity during a boom time in the construction industry effectively disposes of the question of whether petitioner unreasonably accumulated its earnings and profits. For purposes of completeness, however, we note the existence of additional reasonable and reasonably anticipated needs which would also justify some of petitioner's accumulated earnings. From the evidence presented to us, we would conclude that at least $ 550,000 was a reasonable amount for petitioner's anticipated needs for equipment. Further amounts could be justified to provide for contingencies and delays to which the construction industry is particularly vulnerable, inflation and natural growth, but we find *441 it unnecessary to go on as this petitioner is so far ahead now that we might be accused of "running up the score." Respondent has argued that since corporate minutes do not reflect any specific plans for which petitioner earmarked funds, no amount should be allowed as an accumulation for anticipated needs. In our view, this argument ignores the facts and the context under which petitioner was operating. Respondent has missed the forest for the trees. The requirement that a definite plan actually followed must be on the company's books and records before moneys assigned thereto become anticipated needs may have to be appropriately qualified in particular cases. Electric Regulator Corp. v. Commissioner,336 F.2d 339, 346 (2d Cir. 1964). It is true, as respondent points out, that there are no statements in corporate minutes explicitly declaring that the company had set aside a specific amount of money for purposes of meeting anticipated needs for cash resulting from inflation or delays or to fund the purchase of equipment or the expansion of petitioner's business. However, bearing in mind that closely held corporations are not held to the same standard of corporate *442 formalities as publicly held corporations, John P. Scripps Newspapers v. Commissioner,44 T.C. 453, 469 (1965), and considering the evidence herein, the absence of such specific statements in petitioner's records is not a fatal flaw. Petitioner has been in the construction business in the Houston area for over 50 years and is obviously quite skilled in managing its business. Due to the unique circumstances of its business, petitioner was not able to precisely predict its cash needs. It would have been futile for petitioner to assign a particular sum for a specific purpose before a project had been awarded and the structural steel designed. Petitioner's best course of action was to maintain the strength of its overall financial health. Thus, it is unrealistic of respondent to insist that petitioner satisfy certain formal prerequisites. We note that if the minutes of the corporation were replete with plans, projects, contingencies, and other assorted bright ideas, all of which needed money, respondent would be strenuously discounting the minutes and looking for action. Here we have the action and not just the promises. With respect to equipment needs, *443 the record reflects petitioner's practice of purchasing equipment as the need arose and that taller and heavier buildings being built during that time called for bigger and heavier equipment. Therefore, it was reasonable for petitioner to accumulate funds for additional equipment. Additionally, we are not persuaded by respondent's argument that petitioner could have rented equipment or financed its purchases. In our view, this argument asks us to substitute our judgment for that of the corporate officers; this we will not do. Furthermore, the addition of one or two large projects could have increased petitioner's work program by $ 5,000,000. Thus, petitioner could reasonable anticipate that a fairly substantial amount of available cash would be necessary to pursue and successfully handle the significant increase in available work. Finally, our review of the entire record leads us to conclude that petitioner lacked the purpose of avoiding income tax with respect to its shareholders. In this respect, we note that salaries paid to the corporate officers were not unreasonable low and that some dividends were paid. Additionally, we believe the loans to the shareholders were for *444 the bona fide corporate purpose of passing ownership interests in the corporation to the next generation of Petersons, thereby ensuring that ownership would be maintained within the immediate family. Furthermore, the loans have been fully repaid. For the foregoing reasons, we conclude that petitioner did not accumulate its earnings and profits beyond the reasonable needs of the business and that petitioner was not formed or availed of for the purpose of avoiding income tax with respect to its shareholders. To reflect concessions of the parties, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩